**UNITED STATES of America**

v.

**Harvey BIRDMAN, Appellant.**

**UNITED STATES of America**

v.

**William RICHMAN, Appellant.**

**Nos. 78–1940, 78–1979 and 78–1980.**

United States Court of Appeals, Third Circuit.

Argued Feb. 20, 1979.

Decided June 25, 1979.

548

Donald J. Goldberg (argued), Joanna K. Weinberg, Philadelphia, Pa., for appellant Birdman.

Robert Scandone (argued), Philadelphia, Pa., for appellant Richman.

John T. Bannon, Jr. (argued), Jerome M. Feit, T. George Gilinsky, Attys., Dept. of Justice, Washington, D. C., Peter F. Vaira, U. S. Atty., Philadelphia, Pa., and Ronald G. Cole, Philadelphia Strike Force, Philadelphia, Pa., for appellee.

Before ROSENN, VAN DUSEN and' GARTH, Circuit Judges.

## OPINION OF THE COURT

VAN DUSEN, Circuit Judge.

These appeals concern three different varieties of allegedly unethical behavior by attorneys for the United States Government.

Appellant Harvey Birdman raises two questions relating to federal grand jury proceedings: (1) does a Government attorney's alleged violation during such proceedings of the ABA Code of Professional Responsibility's rules against an advocate's testimony constitute an offense warranting dismissal of the resulting indictments; and (2) does the dual employment status of a United States Government agency staff attorney who is deputized as a Special Attorney of the United States Department of Justice to conduct a grand jury investigation constitute a conflict of interest warranting dismissal of an indictment? Appellant William Richman raises these two questions plus a third: did the prosecution break its promise "to consider deferred prosecution" for Mr. Richman, so as to warrant suppression of all evidence allegedly induced by that promise?

We answer all three questions in the negative and affirm the district court's judgments of conviction and sentence.

### I.

A. *Facts relating to grand jury conduct*

The facts relating to the first two questions are largely undisputed.

One Dennis Taylor was a senior staff attorney for the Securities and Exchange

Commission ("SEC"). From 1973 to 1975, he directed the SEC investigation of Delphi Capital Corporation ("Delphi") and of several other companies whose stock was thought to have been manipulated by Delphi. Appellant Birdman was president of one of those companies, Uni-Shield International Corporation, while appellant Richman had had dealings with Uni-Shield stock. Mr. Taylor initiated discussions with the United States Justice Department regarding possible criminal prosecutions of subjects of the SEC investigation, and in May 1975 the Philadelphia Strike Force of the Justice Department asked the SEC to turn over the Delphi investigation file. In June the SEC complied.

On June 13, 1975, the Justice Department designated Mr. Taylor as its Special Attorney authorized to conduct the grand jury proceedings at issue here. After this appointment, Mr. Taylor remained in the SEC's employ and on its payroll, receiving no additional compensation from the Justice Department. He continued to act as an SEC attorney in matters relating to this case, and on at least one occasion acted as an "officer" of the SEC. On that occasion he took testimony of a witness for the SEC investigation, then immediately afterward examined that witness on the same subject before the grand jury for its investigation.

In all of his appearances before the grand jury, Mr. Taylor disclosed to witnesses and to the jury that he was both a special attorney with the Justice Department and an attorney employed by the SEC. When he took testimony for the SEC outside the grand jury room, he introduced himself solely as a staff attorney of the SEC.

On two occasions of which defendants here complain,[1] Mr. Taylor appeared before the grand jury with at least some of the trappings of a witness. On August 15, 1977, after being first duly sworn, Mr. Taylor made what the stenographer's transcript characterizes as a "Statement" to the jury: a monologue purporting to summarize various aspects of the investigation of Uni-Shield and to outline the proposed indictment. On September 6, 1977, again after being duly sworn, Mr. Taylor delivered what the stenographer's transcript characterizes as "Testimony," wherein another Strike Force attorney questioned him on the witness stand and he responded. On this occasion Mr. Taylor presented an account of how he had determined or confirmed the dates of the overt acts listed in the indictment.

On at least one occasion after his August 15 appearance on the witness stand, Taylor, introducing himself as "special attorney with the United States Department of Justice and also an attorney with the United States Securities & Exchange Commission," examined a witness before the grand jury. He also assisted in drafting the indictment with the Justice Department attorneys from the Philadelphia Strike Force. Further, he was present in the grand jury room when one J. Douglas McCullough, then a Strike Force attorney, recommended return of the indictment to the grand jury; Mr. Taylor did not himself make the recommendation to the grand jury.

The grand jury returned indictments against both appellants. It charged Mr. Birdman with conspiracy, mail fraud, securities fraud, securities price manipulation and failure to file required securities reports; Mr. Richman was charged with conspiracy. A subsequent indictment charged Mr. Richman with mail fraud, securities fraud and securities manipulation.

After learning of Mr. Taylor's participation in the grand jury proceedings, defense

1. On November 17, 1976, Mr. Taylor made a "Statement" to the grand jury, in which he simply read the transcript of Mr. Richman's testimony before an expired grand jury (273a–275a). On this occasion it does not appear that Mr. Taylor was sworn in. Defendants do not claim that this appearance warrants dismissal of the indictment. *See, e.g., United States v. Blitz,* 533 F.2d 1329, 1344–45 (2d Cir.), *cert.* denied, 429 U.S. 819, 97 S.Ct. 65, 50 L.Ed.2d 79 (1976) (prosecutor's "ministerial act" of reading testimony from prior grand jury to second grand jury held proper); *cf. United States v. Litton Systems, Inc.,* 573 F.2d 195, 201 (4th Cir.), *cert. denied,* 439 U.S. 828, 99 S.Ct. 101, 58 L.Ed.2d 121 *reh. denied,* 439 U.S. 997, 99 S.Ct. 600, 58 L.Ed.2d 671 (1978) (federal agents summarized prior grand jury evidence).

counsel moved for disclosure of all testimony before the grand jury and for dismissal of the indictment. The district court ordered the Government to turn over to defendants all statements or testimony by Mr. Taylor and other SEC employees appearing before the grand jury. After hearings and after considering the statements and testimony by SEC employees, the district court denied the request for full disclosure of all grand jury testimony and denied the motions to dismiss the indictments.

## B. *Facts relating to promise of deferred prosecution*

Claiming that the Government did not in good faith carry out its promises to him, defendant Richman moved for suppression of evidence allegedly produced in reliance on those promises and for dismissal of his indictments.

At the hearing on these motions, Mr. Richman testified that he and his attorney had met with Mr. McCullough to discuss cooperation. According to Mr. Richman's testimony at that meeting, "Mr. McCullough explained that he would *consider* deferred prosecution,[2] but in order for deferred prosecution to be granted, that the quality of the information and the quantity of the information given by me would be taken into account."[3] In reliance on this promise of consideration for deferred indictment, Mr. Richman asserted, he proceeded to provide certain information to the Government.

Mr. McCullough testified that he did in fact consider recommending deferred prosecution to his superiors, but decided against it. He stated that he took into account several factors, some of which came to his attention after the initial meeting with Mr. Richman: for example, the number of victims of the alleged offenses, and Mr. Rich-

man's untruthfulness at certain times during the investigation.

Mr. McCullough also testified that he had considered deferred prosecution in the past, at the request of other prospective defendants, but had never ended up recommending it. The attorney in charge of the Philadelphia Strike Force also informed the court that to his knowledge the office had never in the past recommended deferred prosecution, but that he was asked to consider the possibility of deferred prosecution for Mr. Richman.

The district court made the following finding, based on this testimony:

"The Court has heard the testimony of Mr. McCullough; has considered the factors which he said he took into consideration. And the Court believes, and so finds, that Mr. McCullough did in fact, in good faith, consider all of the relevant factors known to him in making his decision against recommending deferred prosecution.

. . . . .

"There is no evidence that anyone on behalf of the Government ever misled Mr. Richman to believe that he had a probability of being placed on deferred prosecution. And it is clear from the evidence that any cooperation which he gave in regard to deferred prosecution was only with the hope that the possibility of deferred prosecution would be realized."[4]

Accordingly, the court denied Mr. Richman's motions.

## II. APPELLATE JURISDICTION

The district court denied defendant Richman's individual motions at a hearing on May 10, 1978.[5] After hearings on May 10 and May 23, the court denied the joint motions discussed under heading I.A. above

---

**2.** Mr. Richman testified that he "understood deferred prosecution to be a probationary period, where I would not in fact plead; and I would be placed on probation for a period of time, and at the end of the probationary period the Indictment would be dismissed."

Richman Appendix at 66.

**3.** Richman Appendix at 67 (emphasis added).

**4.** Richman Appendix 186.

**5.** Richman Appendix at 186–87.

on May 23.[6] On that date, both defendants switched their pleas to *nolo contendere,* conditional upon appeal of the denials of their motions. The district court thereupon conditionally sentenced Mr. Birdman to a year's imprisonment, three years' probation, and a $100,000. fine. It conditionally sentenced Mr. Richman to five years' probation. Defendants filed timely notice of appeal.

This procedure conformed with that approved by this court in *United States v. Zudick.*[7] Although that case involved a guilty plea and this case *nolo* pleas, we see no meaningful distinction between the two in this particular respect. Accordingly, we conclude that this court has jurisdiction and that the defendants properly preserved for review the issues here asserted.

## III. THE DUAL ROLE OF PROSECUTOR AND WITNESS

The defendants both contend that the indictments should be dismissed on the ground that Mr. Taylor appeared as a witness before the grand jury, then failed to withdraw as one of the Government's presenting attorneys. Accepting for purposes of this discussion that defendants' characterization of the Government attorney's actions is accurate,[8] we condemn in principle this practice of serving as both prosecutor and witness. However, since the limited testimony of Mr. Taylor was procedural and not substantive in character (see page 23 below) and was not prejudicial to the defendants, in the circumstances of this case we decline to impose the extreme sanction of dismissal.

### A. *The professional impropriety*

The professional impropriety of assuming a dual role as advocate and witness has long been acknowledged by both the English and the American bars.[9] The ABA Code of Professional Responsibility states as an "ethical consideration:"

> "The roles of an advocate and of a witness are inconsistent; the function of an advocate is to advance or argue the cause of another, while that of a witness is to state facts objectively." [10]

The ABA has also codified disciplinary rules designed to prevent this conflict of roles and to minimize its prejudicial potential when prevention is impossible. DR 5–101(B) and DR 5–102 of the ABA Code prevent an attorney from accepting employment as an advocate in litigation when it is obvious that he will also be called as a witness; if the need for his testimony on behalf of his client becomes apparent after

---

6. Birdman Appendix at 415a–427a (hereinafter referred to solely by page number).

7. 523 F.2d 848, 851–52 (3d Cir. 1975); *see United States v. Moskow,* 588 F.2d 882 (3d Cir. 1978).

8. The district court concluded from its examination of Mr. Taylor's statements from the witness stand that those statements represented nothing more than an attorney's summation of evidence and explanation of the indictment, and that therefore the SEC attorney could not properly be characterized as "testifying as a witness" (423a). However, the record shows that the attorney had the external indicia of a witness: he took the oath, and on his September 6, 1977, appearance was questioned by another attorney. The transcript refers to the SEC attorney's utterances on the latter occasion as "Testimony." Although other characteristics of normal testimony may have been lacking, particularly at the August 15 appearance, we are reluctant to draw too fine a line around the words "witness" and "testimony" solely to avoid confronting the ethical dilemma

presented when a prosecutor, without showing a compelling need to do so, takes the stand against a defendant or prospective defendant. See discussion at notes 23 to 26 below.

9. Professor Wigmore finds the first expression of this principle in Anglo-American jurisprudence in *Rex v. Milne,* 2 B. & Ald. 606, note (ca. 1810), and *Rex v. Brice,* 2 B. & Ald. 606 (1819). 6 J. Wigmore, Evidence § 1911 n. 4. In this country, he cites (*id.* at 787–88 n. 10) *Reid v. Colcock,* 1 N. & McC. 592, 597 (N.C.1819), as stating that an attorney is not incompetent to testify, "but it is a matter of much delicacy," and should be avoided unless indispensable. In *Potter v. Inhabitants of Ware,* 55 Mass. (1 Cush.) 519, 520 (1848), the principle that an attorney should not testify on behalf of his client was traced to Roman law.

10. American Bar Association, Code of Professional Responsibility EC 5–9 (1978) (hereinafter "ABA Code"). *See also id.* EC 5–10.

the lawyer has undertaken employment in the litigation, he must withdraw from the role of trial advocate; only in enumerated exceptional circumstances do these requirements not apply, such as where the testimony will relate solely to an uncontested matter or a matter of formality to which no substantial opposing evidence is likely to be offered, or where the lawyer's refusal to serve as advocate would work a substantial hardship on the client because of the lawyer's distinctive value in a particular case.[11]

The ABA Standards Relating to the Prosecution Function [12] make clear that these rules of professional propriety are no less applicable to an attorney for the Government. Section 3.1(f) of the ABA Standards provides:

"The prosecutor should avoid interviewing a prospective witness except in the presence of a third person unless the prosecutor is prepared to forego impeach-ment of a witness by the prosecutor's own testimony as to what the witness stated in an interview or to seek leave to withdraw from the case in order to present his impeaching testimony."

The commentary on this provision emphasizes the profession's rules against an advocate's justifying:

"Use of a third person is virtually the only effective means of impeaching a witness. Assuming a court would permit it, a prosecutor is in a difficult situation if he must seek leave to withdraw and substitute other counsel so that he might take the stand to relate what he claimed the adverse witness had said to him.

"The Code of Professional Responsibility takes a firm position that a lawyer should avoid testifying in court, when he is the advocate. ABA Code DR 5–102." [13]

The courts have shared the legal profession's disapproval of the double role of ad-

---

**11.** ABA Code DR 5–101(B) provides, in pertinent part:

"(B) A lawyer shall not accept employment in contemplated or pending litigation if he knows or it is obvious that he or a lawyer in his firm ought to be called as a witness, except that he may undertake the employment and he or a lawyer in his firm may testify:
(1) If the testimony will relate solely to an uncontested matter.
(2) If the testimony will relate solely to a matter of formality and there is no reason to believe that substantial evidence will be offered in opposition to the testimony.

(4) As to any matter, if refusal would work a substantial hardship on the client because of the distinctive value of the lawyer or his firm as counsel in the particular case."
DR 5–102 provides:
"DR 5–102 Withdrawal as Counsel When the Lawyer Becomes a Witness.
(A) If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial and his firm, if any, shall not continue representation in the trial, except that he may continue the representation and he or a lawyer in his firm may testify in the circumstances enumerated in DR 5–101(B)(1) through (4).

(B) If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm may be called as a witness other than on behalf of his client, he may continue the representation until it is apparent that his testimony is or may be prejudicial to his client."
Former ABA Canon 19 provided:
"When a lawyer is a witness for his client, except as to merely formal matters, such as the attestation or custody of an instrument and the like, he should leave the trial of the case to other counsel. Except when essential to the ends of justice, a lawyer should avoid testifying in court in behalf of his client."
See generally H. Drinker, Legal Ethics 158–59 (1953); ABA Committee on Professional Ethics, Opinions, No. 50 (1931).
Local Rule 11 of the United States District Court for the Eastern District of Pennsylvania provides that the ABA's ethical guidelines "shall become standards of conduct for attorneys of this Court." See Kroungold v. Triester, 521 F.2d 763, 765 n. 3 (3d Cir. 1975).

**12.** America Bar Association Project on Standards for Criminal Justice, Standards Relating to the Prosecution Function and the Defense Function (Approved Draft, 1971) (hereinafter ABA Standards).

**13.** Id. at 80; accord, United States v. Alu, 246 F.2d 29, 34 (2d Cir. 1957).

vocate-witness.[14] In particular, the federal courts have almost universally frowned upon the practice of a Government prosecutor testifying at the trial of the case he is prosecuting, whether for [15] or against [16] the defendant, and have stated that the practice should be permitted only in extraordinary circumstances or for compelling reasons.[17] Where the prosecutor's appearance as witness is unavoidable, the courts have stated that, in general, the prosecutor should withdraw from participation in the trial.[18]

The reasons that have been cited for this judicial and professional reprehension of the testifying prosecutor include the following. First, there is the risk that the prosecutor will not be a fully objective witness:

"It is obvious that the opportunity for tailoring a witness's testimony to the needs of the Government's case is maximized if recourse is permitted to the testimony of an experienced trial attorney who is interested in the successful presentation of that case. Especially in criminal litigation, where so much is at stake for the defendant, must the Bench and Bar demand adherence to a principle that is designed to ensure objectivity in the presentation of evidence." [19]

Second, it is feared that the prestige of a Government attorney's office will artificially enhance his credibility. Although jurors of varying degrees of sophistication will, of course, have different conceptions of the awe due to a public officer, it is widely hypothesized that "[a] jury naturally gives

14. *E.g., United States v. Nobles,* 422 U.S. 225, 253, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975) (White, J., concurring); *Hickman v. Taylor,* 329 U.S. 495, 517, 67 S.Ct. 385, 91 L.Ed. 451 (1947) (Jackson, J., concurring); *Universal Athletic Sales Co. v. American Gym, Recreational Athletic Equipt. Corp.,* 546 F.2d 530, 539 (3d Cir. 1976), *cert. denied,* 430 U.S. 984, 97 S.Ct. 1681, 52 L.Ed.2d 378 (1977); *United States v. Armedo-Sarmiento,* 545 F.2d 785, 793 (2d Cir. 1976), *cert. denied,* 430 U.S. 917, 97 S.Ct. 1330, 51 L.Ed.2d 595 (1977); *United States v. Alu,* 246 F.2d 29, 33–34 (2d Cir. 1957); *Travelers Ins. Co. v. Dykes,* 395 F.2d 747, 748–49 (5th Cir. 1968); *United States v. Clancy,* 276 F.2d 617, 636 (7th Cir. 1960), *rev'd on other grounds,* 365 U.S. 312, 81 S.Ct. 645, 5 L.Ed.2d 574 (1961); *Christensen v. United States,* 90 F.2d 152, 154 (7th Cir. 1937); *Hayes v. United States,* 329 F.2d 209, 218 (8th Cir. 1964); *Robinson v. United States,* 32 F.2d 505, 510 (8th Cir. 1929) (concurring opinion); *United States v. Treadway,* 445 F.Supp. 959, 960–62 (N.D.Tex.1978); *United States v. Maloney,* 241 F.Supp. 49, 50 (W.D.Pa.1965); *see* Annot. 54 A.L.R.3d 100, § 4 (1973) (collecting state decisions).

15. *E.g., United States v. Schwartzbaum,* 527 F.2d 249, 253 (2d Cir. 1975), 424 U.S. 942, 96 S.Ct. 1410, 47 L.Ed. 348 (1976); *Gajewski v. United States,* 321 F.2d 261, 268 (8th Cir. 1963), *cert. denied,* 375 U.S. 968, 84 S.Ct. 486, 11 L.Ed.2d 416 (1964); *Hayes v. United States, supra,* 329 F.2d at 218.

16. *E.g., United States v. Armedo-Sarmiento, supra,* 545 F.2d at 793; *United States v. Torres,* 503 F.2d 1120, 1126; *United States v. Pepe,* 247 F.2d 838, 844 (2d Cir. 1957); *United States v. Alu, supra,* 246 F.2d at 33–34; *United States v. Treadway, supra,* 445 F.Supp. at 260.

17. *E.g., United States v. Schwartzbaum, supra,* 527 F.2d at 253; *United States v. Torres, supra,* 503 F.2d at 1126; *United States v. Clancey, supra,* 247 F.2d at 636; *United States v. Pepe, supra,* 247 F.2d at 844; *United States v. Alu, supra,* 246 F.2d at 33–34; *Christensen v. United States, supra,* 90 F.2d at 154; *Robinson v. United States, supra,* 32 F.2d at 510 (concurring opinion); *United States v. Maloney, supra,* 241 F.Supp. at 50; *see* Annot. A.L.R.3d 100, § 4 (1973).

18. *E.g., United States v. Clancy, supra,* 247 F.2d at 636; *Robinson v. United States, supra,* 32 F.2d at 510 (concurring opinion); *see Newman v. Sigler,* 421 F.2d 1377, 1379 (8th Cir.), *cert. denied,* 399 U.S. 935, 90 S.Ct. 2267, 26 L.Ed.2d 808 (1970) (testifying prosecutor should ordinarily withdraw, but under circumstances failure to do so did not violate constitutional right to fair trial in state court); *Christensen v. United States, supra,* 90 F.2d at 154–55 (trial court should not have excluded counsel's testimony but could have disqualified him afterward). *But see United States v. Fiorillo,* 376 F.2d 180, 185 (2d Cir. 1967) (not abuse of discretion for trial court to refuse to permit defense counsel's withdrawal after testifying); *United States v. Maloney, supra,* 241 F.Supp. at 51 (when defense calls prosecutor, need for withdrawal may be absent).

19. *United States v. Alu, supra,* 246 F.2d at 34. *But see* Sutton, *The Testifying Advocate,* 41 Tex.L.Rev. 477, 480 (1963) ("It is strange to see at this late date an attempt to use this discredited argument . . . .").

to the evidence of the prosecuting attorney far greater weight than to that of the ordinary witness." [20] A third consideration is that the prosecutor's testifying might "create . . . confusion on the part of the jury as to whether he [is] speaking in his capacity of prosecutor or witness." [21] Such confusion, besides disrupting the normal workings of the judicial mechanism, may result in the fact-finder according testimonial credit to the prosecutor's closing arguments.[22]

While the above-cited reasons for the advocate-witness rule all reflect a policy of avoiding the slightest risk of prejudice to defendants, the most frequently cited justification for the rule reflects a broader concern for public confidence in the process of justice. The chief fear which underlies the ethical rule, it is commonly acknowledged, is not that the testifying prosecutor actually will overreach a hapless defendant, but that he will *appear* to a skeptical public to have done so.[23] The legal profession's disapprobation of the advocate-witness is thus closely related to the injunction in Canon 9 of the ABA Code of Professional Responsibility that "[a] lawyer should avoid even the appearance of professional impropriety." [24] Particularly where the lawyer in question represents the prosecuting arm of the Government, the ethical rule serves to implement the maxim that "justice must satisfy the appearance of justice." [25] This function of preserving public trust may be especially necessary in proceedings of the grand jury, which more than a few critics have

**20.** *Robinson v. United States, supra,* 32 F.2d at 510. *Accord, United States v. Treadway, supra,* 445 F.Supp. at 962; *Frank v. State,* 150 Neb. 745, 35 N.W.2d 816, 821 (1949); see *United States v. Pepe,* 247 F.2d 838, 844 (2d Cir. 1957) (prosecutor "threw his own weight into the scales against defendant"). *But see United States v. Cerone,* 452 F.2d 274, 288 (7th Cir. 1971), *cert. denied,* 405 U.S. 964, 92 S.Ct. 1168, 31 L.Ed.2d 240 (1972) ("As to the awesome-office theory, we do not agree that the mere fact that a witness holds an office of public trust should disqualify him as a witness [where he does not otherwise participate in the trial] . . . ."); *United States v. Callanan,* 450 F.2d 145 (4th Cir. 1970) (same).

The hypothesis that a Government attorney carries an enhanced image in the mind of the average juror also underlies the proscription against prosecutors' expressing personal belief in the credibility of a witness or the guilt of a defendant, in ABA Standards, *supra* note 12, at § 5.8(b). *Id.,* Commentary, 126–28, and authorities cited therein; see, e.g., *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). *See also, e.g., United States v. Gallagher,* 576 F.2d 1028, 1041–43 (3d Cir. 1978).

**21.** *Newman v. Sigler, supra,* 421 F.2d at 1379 (8th Cir. 1970); *accord, United States v. Schwartzbaum, supra,* 527 F.2d at 253.

**22.** *See, e.g.,* Note, *The Attorney as Both Advocate and Witness,* 4 Creighton L.Rev. 128, 144 (1970) (hereinafter, *Advocate and Witness*); Note, *The Advocate-Witness Rule: If Z Then X, But Why?,* 52 N.Y.U.L.Rev. 1365, 1370 (1977) (hereinafter, *Advocate-Witness Rule*).

**23.** 6 J. Wigmore, Evidence § 1911, at 775–76; Sutton, *supra* note 19 at 482; Note, *Advocate and Witness, supra,* note 22, at 145; Note, *Advocate-Witness Rule, supra,* note 22, at 1369; see *Frank v. State,* 150 Neb. 745, 35 N.W.2d 816, 821 (1949) (natural tendency for defendant to question fairness of trial). *See generally, e.g. Erwin M. Jennings Co. v. DiGenova,* 107 Conn. 491, 492–500, 141 A. 866, 867–69 (1928) (primary reason for rule is to avoid bringing distrust on legal profession).

Some courts and commentators have questioned the validity of the appearance justification. *International Electronics Corp. v. Flanzer,* 527 F.2d 1288, 1294 (2d Cir. 1975); Enker, *The Rationale of the Rule That Forbids A Lawyer To Be Advocate and Witness in the Same Case,* 1977 Am.Bar Foundation J. 455, 459; Note, *Advocate-Witness Rule, supra,* at 1390 ("the tenuous assumptions upon which the appearance of impropriety fear rest have never been empirically examined").

**24.** This court has held that violation of the injunction in Canon 9 is a proper ground for disqualifying an attorney. *Int'l Business Machines, Inc. v. Levin,* 579 F.2d 271, 283 (1978); *Kramer v. Scientific Control Corp.,* 534 F.2d 1085, 1089 (3d Cir.), *cert. denied,* 429 U.S. 830, 97 S.Ct. 90, 50 L.Ed.2d 94 (1976); *Richardson v. Hamilton International Corp.,* 469 F.2d 1382, 1385–86 & n. 12 (3d Cir. 1972), *cert. denied,* 411 U.S. 986, 93 S.Ct. 2271, 36 L.Ed.2d 964 (1973).

**25.** *Offutt v. United States,* 348 U.S. 11, 14, 75 S.Ct. 11, 13, 99 L.Ed. 11 (1954) (Frankfurter, J.). *Accord,* 2 J. B. Atlay, Victorian Chancellors 460 (1908) (quoting Lord Herschell):

"[I]mportant as it was that people should get justice, it was even more important that they should be made to feel and see that they were getting it."

characterized as a mere tool of prosecutors.[26] Even an unarticulated sense among grand jurors or their friends that something was "fishy" about a proceeding where the prosecutor testified will feed cynics' claims.

The foregoing considerations and others [27] demonstrate that the general disapprobation of an advocate's testimony is more than an outdated shibboleth disguised as a rule of professional ethics. Furthermore, the justifications cited for the rule are as pertinent to grand jury proceedings as they are to trials before petit juries, where the rule is most often visible. That the rule applies to prosecutors in grand jury proceedings, as well as in criminal trials, is implicit in § 3.5(b) of the ABA Standards Relating to the Prosecution Function, which provides:

"The prosecutor should not make statements or arguments in an effort to influence grand jury action in a manner which would be impermissible at trial before a petit jury."

The Commentary to § 3.5 amplifies this directive:

"A prosecutor should not, however, take advantage of his role as the ex parte representative of the state before the grand jury to unduly or unfairly influence it in voting upon charges brought before it. *In general, he should be guided by the standards governing and defining the proper presentation of the state's case in an adversary trial before a petit jury.*" (Emphasis added.)

The standards for presenting the state's case to a petit jury [28] clearly preclude the prosecutor's testifying, except in the limited circumstances referred to in DR 5–101(B) of the ABA Code (see note 11 above).

B. *Legal sanctions for impropriety*

The issue before this court, however, is not whether professional sanctions would be appropriate against a Government attorney who both assisted the prosecution and appeared on the witness stand in the same grand jury proceeding. The issue is wheth-

---

**26.** *United States v. Lardieri,* 506 F.2d 319, 324 (3d Cir. 1974); *Robert Hawthorne, Inc. v. Director of IRS,* 406 F.Supp. 1098, 1114 n. 28 (E.D.Pa.1976); *see, e.g., Federal Grand Jury: Hearings on H.J. Res. 46 H.R. 1277 and Related Bills Before the Subcomm. on Immigration, Citizenship & International Law of the House Comm. on the Judiciary,* 94th Cong. 2d Sess. 52 (1976); Antell, *The Modern Grand Jury: Benighted Supergovernment,* 51 A.B.A.J. 153 (1965); Schwartz, *Demythologizing the Historic Role of the Grand Jury,* 10 Am.Crim.L.Rev. 701 (1972); Boudin, *The Federal Grand Jury,* 61 Geo.L.J. 1 (1972); Fine, *Federal Grand Jury Investigation of Political Dissidents,* 7 Harv. Civ.Rts.—Civ.Lib.L.Rev. 432 (1972); Younger, *The Grand Jury Under Attack,* 46 J.Crim.L. 26, 214 (1955); Goodell, *Where Did the Grand Jury Go?* Harper's Mag., May 1973; Cowan, *The New Grand Jury,* N.Y. Times Mag., April 29, 1973. *See generally* Nat'l Lawyers Guild, *Representation of Witness Before Federal Grand Juries: A Manual for Attorneys* (1974).

**27.** Concern for the attorney's interest is another justification frequently cited for the rule. The underlying psychological hypothesis is that one who tries to perform both roles does neither well: "[t]o attempt to be both advocate and witness is to attempt to be both partisan and non-partisan at once . . . . The dual role is too difficult; the lawyer should not be subjected to such a riptide of demands . . .." Sutton, *supra* note 19 at 481 (footnote omitted). As Justice Jackson put it, the lawyer "is almost

invariably a poor witness." *Hickman v. Taylor,* 329 U.S. 495, 517, 67 S.Ct. 385, 396, 91 L.Ed. 451 (1947) (Jackson, J., concurring). Conversely, if he is too good a witness, he may find himself a worse advocate upon reassuming the latter role. Sutton, *supra* at 481. As an advocate, too, he may find himself confronted with the dubious and demeaning task of arguing his own credibility as a witness. *E.g.,* ABA Code, *supra,* note 10, at EC 5–9; Sutton, *supra* at 481; Note, *The Advocate-Witness Rule, supra,* note 22 at 1371.

The ABA Code also emphasizes the protection of the advocate's client as a rationale for the rule. *See* EC 5–9. This rationale rests on the hypothesis that a testifying lawyer is *less* credible and more easily impeached than other witnesses—a hypothesis contrary to that which supports the rationale discussed above in the text at note 20. The drafters of the ABA Code were focusing primarily on the lawyer for the private client; protection of the testifying lawyer's client may be less of a concern when the client is the Government. Nevertheless, it is clear that the drafters of the ABA Standards for the Prosecution Function intended the same restrictions to apply to the Government lawyer, though some of the underlying rationales for the restrictions might be different. *See* ABA Standards quoted in text at note 13 above.

**28.** See text at note 13 above.

er such conduct requires the legal sanction of dismissing the resulting indictments.

### 1. *Per se rule of dismissal?*

Defendants argue that this court should impose a per se rule mandating dismissal for any prosecutorial testimony in grand jury proceedings, regardless of actual prejudice to the defendant resulting therefrom. In support of this argument, defendants rely primarily on a decision out of the Northern District of Texas, *United States v. Treadway,*[29] which appears to impose such a rule. However, to the extent that decision deals with the issues raised in this case, we decline at this time to follow it.

It should first be noted that in the analogous situation where a prosecutor testifies at trial and then fails to withdraw, the great weight of American authorities have held that such conduct, while reprehensible, does not warrant the sanction of reversal and new trial.[30] As this court has noted in the civil context, "the Code [of Professional Responsibility] does not delineate rules of evidence but only sets forth strictures on attorney conduct."[31] Thus, it is the settled rule in this Circuit and in most jurisdictions that an attorney is not incompetent as a witness at trial,[32] but that admission of such testimony is a matter largely for the discretion of the trial court.[33] In the federal courts particularly, the strong judicial reprobation of a prosecutor's testimony at a criminal trial has never hardened into a per se prohibition of the practice:[34] prosecutorial testimony alone is not sufficient for reversal, absent additional instances of Government misconduct.[35]

**29.** 445 F.Supp. 959 (N.D.Tex.1978).

**30.** *See Erwin M. Jennings Co. v. DiGenova,* 141 A. at 869, and authorities cited therein (while "[t]he rule in England appears to be that an attorney is incompetent as a witness for his client," the weight of American authorities holds the admission of attorney's testimony not reversible error); 6 J. Wigmore, Evidence, at 788; Annotation, 54 A.L.R.3d 100, § 63 (1973).

**31.** *Universal Athletic Sales Co. v. American Gym, Recreational & Athletic Equipment Corp., supra,* 546 F.2d at 539.

**32.** *Id.* (civil trial), 6 J. Wigmore, Evidence § 1911 (civil and criminal); 97 C.J.S., *Witnesses* § 113 (1957 & Supp. 1978) (criminal); Annot., 54 A.L.R.3d 100, § 3 (1973) (criminal); *see, e.g., French v. Hall,* 119 U.S. 152, 7 S.Ct. 170, 30 L.Ed. 375 (1886) (civil); decisions cited in note 35, *infra* (criminal).

**33.** See authorities cited in note 32, *supra* (trial court permitted testimony); *see also United States v. Schwartzbaum, supra,* 527 F.2d at 253 (trial court refused to let defendant call prosecutor); *United States v. Phillips,* 519 F.2d 48, 50 (5th Cir. 1975), *cert. denied,* 423 U.S. 1059, 96 S.Ct. 796, 46 L.Ed.2d 650 (1976) (refused to let defense attorney testify for defendant); *United States v. Newman,* 476 F.2d 733 (3d Cir. 1973) (refused to let defense call prosecutor); *Hayes v. United States, supra,* 329 F.2d at 218 (same); *Gajewski v. United States, supra,* 321 F.2d at 268 (same); *United States v. Clancy, supra,* 276 F.2d at 636 (refused to let defense attorney testify unless he withdrew); *Fisher v. United States,* 231 F.2d 99, 104 (refused to let defense call prosecutor). *But see Christensen v. United States, supra,* 90 F.2d at 154–55 (error to exclude testimony of defense attorney).

**34.** One explanation for the courts' reluctance to harden what might be termed an "axiomatic norm" (*see Kramer v. Scientific Control Corp.,* 534 F.2d 1085, 1088 (3d Cir. 1976)) of proper professional conduct into a "rule in the narrower sense" (*see id.;* Pound, *Hierarchy of Sources & Forms in Different Systems of Law,* 7 Tul.L. Rev. 475 (1933)), requiring a sanction of reversal, is that less drastic sanctions lie elsewhere. At least where the defendant has shown no actual prejudice to himself arising from the Government attorney's alleged unethical conduct, professional disciplinary proceedings, in which the Government attorney can explain the reasons for his conduct or point to mitigating factors, seem a remedy better tailored to the impropriety than that of letting the criminal go free because the prosecutor may have blundered. Wigmore has further suggested that the strong judicial disapproval has not turned into judicial prohibition

> "because the expected evil is one that would be caused by an inveterate practice and not by casual instances, and because the strong recommendations of the courts have proved sufficient to prevent the use of such testimony other than in casual, unavoidable, and therefore harmless instances."

6 J. Wigmore, Evidence § 1911, at 788. These considerations are equally applicable where the prosecuting attorney is alleged to have served as a witness in grand jury proceedings. See discussion at notes 53 and 54 below.

**35.** *E.g., Backo v. Local 281, United Bhd. of Carpenters,* 438 F.2d 176, 179 (2d Cir. 1970), *cert. den.,* 404 U.S. 858, 92 S.Ct. 110, 30 L.Ed.2d 99 (1971); *Newman v. Sigler, supra,* 421 F.2d at 1379; *United States v. Alu, supra,*

In light of this established principle that an automatic grant of new trial is not in general an appropriate legal sanction for a prosecutor's testifying at trial,[36] a compelling legal mandate is necessary if this court is to impose the analogous sanction of per se dismissal, where an indictment issues from grand jury proceedings in which the prosecutor has taken the witness stand and failed to withdraw. There are three sources for such a mandate mentioned in the federal cases: the Constitution; Rule 6(d) of the Federal Rules of Criminal Procedure, which enumerates persons authorized to be present at grand jury proceedings; and the public policy of assuring fairness in the processes of justice, which underlies the supervisory powers of the federal courts.[37]

Defendants do not argue, nor do we find, that the prosecutorial conduct here rises to the level of a constitutional violation.[38] Thus we need not consider whether a prophylactic rule of dismissal would be justified under the power to make what has been termed a "constitutional common law" [39] of remedies for violation of constitutional rights.

Instead defendants argue that a per se rule of dismissal is required under Rule 6(d) of the Federal Rules of Criminal Procedure. Rule 6(d) provides:

"Attorneys for the government, the witness under examination, interpreters when needed and, for the purpose of taking the evidence, a stenographer or operator of a recording device may be present while the grand jury is in session, but no person other than the jurors may be present while the grand jury is deliberating or voting."

Defendants urge this court to follow the lead of the United States Court of Appeals for the Fifth Circuit, which has held that "the presence of an unauthorized person [under Rule 6(d)] results in a per se invalidity of the indictment." [40]

However, the question whether to adopt this sanction of dismissal does not arise until it has been established that the alleged intruder filled none of the authorized roles listed in Rule 6(d).[41] Here the whole ethical dilemma arises not because a person fit none of the listed roles, but because one person allegedly played two of those roles: both "attorney for the government" and "witness under examination." After that person withdrew from the witness stand, as a matter of professional ethics he ought to have withdrawn also from his role as "at-

---

246 F.2d at 34; *see Irvin v. Zerbst,* 97 F.2d 257, 258 (5th Cir.), *cert. denied,* 305 U.S. 597, 59 S.Ct. 97, 83 L.Ed. 379 (1938) (habeas corpus proceeding); *cf. Christensen v. United States,* 90 F.2d at 155 (reversal for refusal to admit defense attorney's testimony on behalf of defendant). Although some federal courts of appeals have granted a new trial where the trial court had admitted a prosecutor's testimony against the defendant, such cases have involved other instances of misconduct. *United States v. Torres, supra,* 503 F.2d at 1126; *United States v. Pepe, supra,* 247 F.2d at 844; *Robinson v. United States, supra,* 32 F.2d at 510 (concurring opinion) ("If this were the only question in the case, it might not be sufficient to warrant a reversal").

**36.** *See* authorities cited in note 35, *supra. See generally United States v. Somers,* 496 F.2d 723, 737 (3d Cir.), *cert. denied,* 419 U.S. 832, 95 S.Ct. 56, 42 L.Ed.2d 58 (1974):

"[W]e will reverse upon demonstrations of prosecutorial misconduct only in those situations in which prejudice inures to the defendant from the challenged improprieties."

**37.** *See United States v. Treadway,* 445 F.Supp. 959 (N.D.Tex.1978).

**38.** *See, e. g., United States v. Lardieri,* 506 F.2d 319, 323 (3d Cir. 1974); *United States v. Riccobene,* 451 F.2d 586, 587 (3d Cir. 1971); *United States v. Bruzgo,* 373 F.2d 383, 387 (3d Cir. 1967).

**39.** Monaghan, *The Supreme Court, 1974 Term —Foreword: Constitutional Common Law,* 89 Harv.L.Rev. 1 (1975); *see* Schrock & Welsh, *Reconsidering the Constitutional Common Law,* 91 Harv.L.Rev. 1117 (1978).

**40.** *United States v. Echols,* 542 F.2d 948, 951 (5th Cir.), *cert. denied,* 431 U.S. 904, 97 S.Ct. 1695, 52 L.Ed.2d 387 (1977), *reaffirming Latham v. United States,* 226 F. 420 (5th Cir. 1915). *Accord, United States v. Phillips Petroleum Co.,* 435 F.Supp. 610, 618 (N.D.Okl.1977).

**41.** Thus, in *Echols, supra,* the district court did not dismiss the indictment because the person in question was found to be an authorized person. *Accord, United States v. Glassman,* 562 F.2d 954, 957 (5th Cir. 1977).

torney for the government," to avoid any appearance of professional impropriety. But a professional impropriety does not work a metaphysical dissolution of his actual status as government counsel: the many cases in which trial courts have permitted testifying advocates to continue their participation at trial [42] demonstrate that their testimony could not by itself deprive them of legal authority to represent their clients. Nothing in the plain language of Rule 6(d) or in its legislative history indicates that the rule was intended to have such an effect; the Rule's concern is to exclude persons with no authorized roles not to implement the profession's proscriptions against conflicting roles. In sum, reprehensible though it might be for one who has served as a grand jury witness to remain as "attorney for the government," Rule 6(d) does not prevent such conduct as a matter of law.

Defendants might have pressed the argument that this court should impose a pro-phylactic rule of dismissal in the exercise of its inherent supervisory authority over federal criminal proceedings.[43] This general power of supervision enables the federal courts to establish standards of fair play higher than "those minimal historic safeguards for securing trial by reason which are summarized as 'due process of law' and below which we reach what is really trial by force." [44] Further, the policy underlying the supervisory power that "[t]he protection of its own functions and the preservation of the purity of its own temple belongs only to the court" [45] is in general harmony with the most widely cited rationale for the disapproval of the prosecutor-witness, that the unseemly appearance of the practice tends to undermine public confidence in judicial processes.[46]

However, to attempt to serve a public interest in the purity of the grand jury proceeding, by the per se sanction of dismissing indictments, is to disserve another

**42.** See decisions cited in note 35, *supra.*

**43.** *See, e.g., United States v. Jacobs,* 531 F.2d 87, 90 (2d Cir.), *vacated and remanded,* 429 U.S. 909, 97 S.Ct. 299, 50 L.Ed.2d 277, *aff'd on remand,* 547 F.2d 772 (2d Cir. 1976), *cert. dismissed,* 436 U.S. 31, 98 S.Ct. 1873, 56 L.Ed.2d 53 (1978); *United States v. Minnesota Mining & Mfg. Co.,* 551 F.2d 1106, 1112 (8th Cir. 1977); *United States v. Henderson,* 525 F.2d 247, 250 & n. 12 (5th Cir. 1975). The supervisory authority to dismiss an indictment is discussed but not applied in, *e.g., United States v. Blue,* 384 U.S. 251, 254–55, 86 S.Ct. 1416, 16 L.Ed.2d 510 (1966); *Costello v. United States,* 350 U.S. 359, 363–64, 76 S.Ct. 406, 100 L.Ed. 397 (1956); *Holt v. United States,* 218 U.S. 245, 247–48, 31 S.Ct. 2, 54 L.Ed. 1021 (1910); *United States v. Broward,* 594 F.2d 345, 351 (2d Cir.), *cert. petition filed,* —— U.S. ——, 99 S.Ct. 2882, 61 L.Ed.2d 310 (1979); *United States v. Fields,* 592 F.2d 638 (2d Cir. 1978), *cert. petition filed,* —— U.S. ——, 99 S.Ct. 2838, 61 L.Ed.2d 284 (1979); *United States v. Owen,* 580 F.2d 365, 367 (9th Cir. 1978); *United States v. Chanen,* 549 F.2d 1306, 1309 (9th Cir.), *cert. denied,* 434 U.S. 825, 98 S.Ct. 72, 54 L.Ed.2d 83 (1977); *United States v. Baskes,* 433 F.Supp. 799, 804–07 (N.D.Ill. 1977) (requiring amplification before exercising power to dismiss). For discussion of the supervisory power and of prophylactic rules thereunder which affect criminal trials, *see generally, e.g., McNabb v. United States,* 318 U.S. 332, 340–42, 63 S.Ct. 608, 87 L.Ed. 819 (1956); *Olmstead v. United States,* 277 U.S. 438, 469–71, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (Holmes, J., dis-

senting); *United States v. Fioraventi,* 412 F.2d 407 (3d Cir.), *cert. denied,* 396 U.S. 837, 90 S.Ct. 97, 24 L.Ed.2d 88 (1969); *United States ex rel. Sturdivant v. New Jersey,* 289 F.2d 846, 848 (3d Cir.), *cert. denied,* 368 U.S. 864, 82 S.Ct. 109, 7 L.Ed.2d 61 (1961); Note, *The Supervisory Power of the Federal Courts,* 76 Harv.L. Rev. 1656 (1963).

**44.** *McNabb v. United States, supra,* 318 U.S. at 340, 63 S.Ct. 608. This court has expressly espoused similar sentiments in *United States ex rel. Sturdivant v. New Jersey, supra:*

" 'Over federal proceedings we may exert a supervisory power with greater freedom to reflect our notions of good policy than we may constitutionally exert over proceedings in state courts.' "

289 F.2d at 848, *quoting Fay v. People of State of New York,* 332 U.S. 261, 287, 67 S.Ct. 1613, 91 L.Ed. 2043 (1947); *accord, e.g., United States v. Basurto,* 497 F.2d 793 (9th Cir. 1974) (Hufstedler, J., concurring); *United States v. Cruz,* 478 F.2d 408, 411 (5th Cir.), *cert. denied,* 414 U.S. 910, 94 S.Ct. 259, 38 L.Ed.2d 148 (1973); Note, *The Supervisory Power of the Federal Courts, supra* note 43, at 1666–67 (1963).

**45.** *Sorrells v. United States,* 287 U.S. 435, 457, 53 S.Ct. 210, 218, 77 L.Ed. 413 (1932) (separate opinion of Roberts, J.).

**46.** See discussion at notes 23–27 above.

public interest by frustrating prosecutions of criminals. The question whether to impose a prophylactic supervisory rule traditionally presents this choice between two evils: on the one hand, the evil "that the Government should play an ignoble part," and on the other "that some criminals should escape." [47]

In balancing these evils in cases of alleged prosecutorial overreaching during grand jury proceedings, the federal courts have clearly established the principle "that the dismissal of an indictment on the basis of governmental misconduct is an extreme sanction which should be infrequently utilized." [48] Thus, in *United States v. Bruzgo*,[49] which treated allegations of prosecutorial misconduct more extreme than those in the case before us, this court affirmed the refusal to apply such a sanction. In *Bruzgo* the defendant claimed that the prosecutors had threatened a grand jury witness, a close associate of the defendant, and had called the witness a "thief" and "a racketeer," allegedly moving the grand jurors to such a passion that they "hissed" the witness. Accepting these allegations as true, and condemning the prosecutor's actions, this court nevertheless concluded that

their conduct was not sufficient to invalidate an indictment which was otherwise supported by the evidence.[50] This court reached the same conclusion in a similar case, *United States v. Riccobene*,[51] where the prosecutor had told grand jurors that they would not hear from a key Government witness because the proposed defendants were " 'connected with organized crime and could harm him.' " [52]

■ In view of the extreme character of this sanction of per se dismissal, we are not persuaded that so broad-gauged a remedy is necessary to supplement existing disciplinary procedures.[53] While we acknowledge the public interest in avoiding "even the appearance of impropriety" in prosecutors' conduct of federal grand jury proceedings, defendants have not shown that the conduct of which they complain added substantive matters or was anything but an isolated incident unmotivated by sinister ends.[54] A later case might require a different result. There has been no showing here that the practice of prosecutorial testimony has become so entrenched and flagrant in this Circuit as to require a prophylactic rule of dismissal.[55] Therefore, we decline to

---

**47.** *See United States v. Olmstead, supra*, 277 U.S. at 470, 48 S.Ct. at 575 (Holmes, J., dissenting).

**48.** *United States v. Owen, supra*, 580 F.2d at 367; *accord, e.g., United States v. Fields, supra*, 592 F.2d at 647–48; *United States v. Chanen, supra*, 549 F.2d at 1310–12, and decisions discussed therein; *Beatrice Foods Co. v. United States*, 312 F.2d 29, 39 (8th Cir.), *cert. denied*, 373 U.S. 904, 83 S.Ct. 1289, 10 L.Ed.2d 199 (1963); *United States v. Dondich*, 460 F.Supp. 849, 855 (N.D.Cal.1978); *United States v. Baskes, supra*, 433 F.Supp. at 806; *see, e.g., United States v. Houghton*, 554 F.2d 1219, 1224 (1st Cir.) *cert. denied*, 434 U.S. 851, 98 S.Ct. 164, 54 L.Ed.2d 120 (1977) (finding misconduct insufficient to merit dismissal); *United States v. Cruz, supra*, 478 F.2d at 441.

An alternative formulation of the above proposition is that a reviewing court will not look behind a facially valid indictment absent strong reasons for doing so. *See, e.g., Costello v. United States, supra*, 350 U.S. at 363, 76 S.Ct. 406 (no dismissal of indictment based solely on hearsay evidence); *Holt v. United States, supra*, 218 U.S. at 248, 31 S.Ct. 2 (incompetent evidence). *See also United States v. Calandra*,

414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1978).

**49.** 373 F.2d 383 (3d Cir. 1967).

**50.** *Id.* at 386–87.

**51.** 451 F.2d 586 (3d Cir. 1971).

**52.** *Id.* at 587.

**53.** See note 34, *supra*.

**54.** It is routine procedure for the prosecution to put its investigators on the stand in grand jury proceedings, whether the investigator be an FBI agent or an employee of a specialized agency like the SEC or IRS. Here, the investigator had also become an attorney for the Government through the relatively non-routine procedure of the § 515 authorization. The Strike Force team may have simply followed its standard procedure for investigator-witnesses without realizing the impropriety created thereby in the circumstances of this case.

**55.** *See United States v. Broward, supra*, 594 F.2d at 351.

stretch the ill-defined contours of the supervisory power to impose such a rule in this case.[56]

### 2. *Dismissal for actual prejudice to defendants*

Even in the absence of a per se rule of dismissal, dismissal of the indictment might be justified if defendants suffered actual prejudice from the Government attorney's appearance on the witness stand and subsequent failure to disqualify himself. However, the district court found no such prejudice in this case, and we agree that there was none.

The district court concluded, based on its examination of pertinent portions of the record, that the Government attorney's presentations from the witness stand on August 15, 1977, and September 6, 1977, did not amount to independent substantive evidence:

> "[A] fair reading of the transcript of August 15, 1977, reveals, and the Court so finds, that he was acting . . . as an attorney; explaining a proposed indictment; identifying the parties named in the indictment; reviewing evidence presented to the Grand Jury which supported the indictment.
>
> "It is clear that he was not then . . . giving material or substantive evidence.
>
> . . . . .
>
> ". . . [the September 6 'testimony'] was the supplying or explaining to the Grand Jury the indictment which they would be asked to return that same day. There is an explanation as to how the various dates used in the indictment were arrived at.
>
> "The basic structure of the examination was that, starting with each overt act in the conspiracy, to ask Mr. Taylor how the particular date was arrived at.
>
> . . . . .

> "Reading the transcript as a whole, it appears to this Court that he was in fact summarizing evidence which the Grand Jury had had presented to it by other witnesses."[57]

Our reading of the pertinent portions of the grand jury transcripts bears out the district court's above-quoted conclusion that the Government attorney's testimony added no new material evidence. Although the testimony summarizes contestable substantive evidence, it focusses primarily on the structure of the proposed indictment. We need not decide whether such testimony falls within exceptions (1) and (2) of DR 5–101(B) in the ABA Code, as "relat[ing] solely to an uncontested matter," or "relat[ing] solely to a matter of formality." It is enough for present purposes that this testimony could not "have had independent material significance in the jurors' minds when they considered whether they wanted to indict defendant."[58]

This case is in this respect distinguishable from the facts of the *Treadway* case on which appellants chiefly rely. There the prosecutor-witness provided independent substantive evidence which was needed to prove a material element of the offense charged in the indictment;[59] here the testimony discloses that it was merely a summary of prior evidence. Furthermore, it was alleged in *Treadway* that the prosecutor's testimony was inaccurate in several respects.[60] Defendants here do not allege that the prosecutor falsified or distorted any substantive facts underlying the indictments to which defendants later pleaded *nolo contendere*. We are also satisfied that the testimony was phrased in neutral terms, without possibility for inflammatory effect.

In sum, although *Treadway* was decided on the basis of a per se rule of dis-

---

**56.** See decisions cited in note 48; *cf. Board of Education of New York v. Nyquist,* 590 F.2d 1241 at 1247 (2d Cir., 1979) ("when there is no claim that the trial will be tainted, appearance of impropriety is simply too slender a reed on which to rest a disqualification order except in the rarest cases").

**57.** App. 323a–324a.

**58.** *United States v. Bruzgo, supra,* 373 F.2d at 386.

**59.** 445 F.Supp. at 960, 964.

**60.** *Id.* at 964.

missal, it is factually· distinguishable from this case because here it is possible to ascertain that no actual prejudice to defendants could have resulted from the prosecutor's testimony. For this arguable injury to the grand jury process, it appears at this time that more appropriate remedies exist than a windfall dismissal for unharmed parties.[61]

## IV. DUAL EMPLOYMENT STATUS OF GOVERNMENT ATTORNEY

Both defendants in this case also urge dismissal of the indictment on the ground that an impermissible conflict of interest inhered in Mr. Taylor's dual employment status as a staff attorney for the SEC and a Special Attorney for the Justice Department, appointed pursuant to 28 U.S.C. § 515(a) and § 534.[62] To support their ·argument, defendants rely primarily on a decision by a. panel of the United States Court of Appeals for the Sixth Circuit, *In Re April 1977 Grand Jury Subpoenas (General Motors Corp.),* 573 F.2d 936 (6th Cir. 1978), *appeal dismissed en banc,* 584 F.2d 1366 (1978), *cert. denied,* 440 U.S. 934, 99 S.Ct. 1277, 59 L.Ed.2d 492 (1979). We find their argument unpersuasive.

In *General Motors,* an Internal Revenue Service (IRS) attorney, who was familiar with a prior civil tax investigation of General Motors Corporation and who had recommended criminal prosecution of the company to the Justice Department, was appointed a Special United States Attorney to assist in the grand jury proceedings. A majority of the appeals court panel concluded that this dual employment status created an appearance of a conflict of interest, warranting disqualification of the attorney. Judge Merritt, dissenting, found neither improper conflict nor appearance thereof. After rehearing, the court *en banc* dismissed the appeal for lack of appellate jurisdiction. While the *en banc* majority found it unnecessary to reach the merits, the concurring opinion of Judges Edwards and Lively expressed their agreement with Judge Merritt's earlier dissenting view that "[t]here is no inherent conflict of interest in" the dual Government employment status at issue. 584 F.2d at 1371.

In recent subsequent decisions by other courts, this latter view has prevailed. The United States Court of Appeals for the Seventh Circuit held, in *In re Perlin,* 589 F.2d 260 (7th Cir. 1978), that no impermissible conflict was inherent in a Commodity Futures Trading Commission (CFTC) attor-

---

**61.** It bears repeating that this decision should not be construed as a license to prosecutors to take the witness stand in grand jury proceedings.· In future cases, this court may dismiss indictments on a showing that actual prejudice has resulted from such undesirable prosecutorial conduct, or on a showing that it is impossible to ascertain the degree of prejudice without examination of much more of the grand jury proceedings than was necessary here. Furthermore, if the practice persists, a prophylactic rule of dismissal, regardless of prejudice, may become necessary.

**62.** 28 U.S.C. § 515(a) (1977) provides:

"The Attorney General or any other officer of the Department of Justice, *or any attorney specially appointed by the Attorney General under law, may, when specifically directed by the Attorney General, conduct any kind of legal proceeding,* civil or criminal, *including grand jury proceedings* and proceedings before committing magistrates, which United States attorneys are authorized by law to conduct, whether or not he is a resident of

the district in which the proceeding is brought." (Emphasis added.)
Section 534 provides, in pertinent part:
"(a) The Attorney General shall—
(1) acquire, collect, classify, and preserve identification, criminal identification, crime, and other records; and
(2) exchange these records with, and for the official use of, authorized officials of the Federal Government, the States, cities, and penal and other institutions.

. . . . .

"(c) The Attorney General may appoint officials to perform the functions authorized by this section."
Defendants do not challenge the authority of the Attorney General to appoint the SEC attorney as a Special United States Attorney to assist in grand jury proceedings in this case. That authority was extensively examined and upheld in *In re Subpoena of Persico,* 522 F.2d 41, 56–60 (2d Cir. 1975); *United States v. Wrigley,* 520 F.2d 362, 365–67 (8th Cir. 1975).

ney's participation as a Special Assistant United States Attorney in grand jury proceedings; it thus affirmed a contempt judgment against a recalcitrant witness who claimed that the CFTC attorney's participation had tainted the proceedings. Similarly, in *United States v. Dondich,* 460 F.Supp. 849 (N.D.Cal.1978), the district court refused to dismiss an indictment on account of a specially authorized SEC lawyer's participation in the grand jury proceedings from which the indictment issued.

Both *Perlin* and *Dondich* involved attorneys from specialized Government agencies who, like Mr. Taylor in this case, had worked on their agency's civil investigations of transactions which were later objects of grand jury inquiry. In both cases, after the agency turned over evidence of possible criminal violations to the Department of Justice, the agency attorney was appointed a Special Assistant United States Attorney under 28 U.S.C. §§ 515(a) and 534, again like Mr. Taylor in this case. The specially deputized attorneys in *Perlin* and *Dondich* also maintained close contacts with their original agencies while working on grand jury matters, as did Mr. Taylor, who remained on the SEC payroll and continued to work for the SEC on matters relating to this case.

On facts substantially the same as those involved in this case, both *Perlin* and *Dondich* expressly rejected the position of the panel majority in *General Motors.* To summarize briefly, both decisions concluded that an attorney representing different agencies of the same Government is not engaged in the kind of conflict of interest which the drafters of the ABA Standards Relating to the Prosecution Function and the ABA Code [63] intended to address:

> "[A]lthough the prosecutor should not be a professional associate of defense counsel, there is no conflict or appearance of conflict in his being professionally associated with other lawyers interested in the prosecution. The prosecutor of course is himself interested in the prosecution, but that is not the sort of interest that creates a conflict." [64]

---

**63.** Section 1.2 of the ABA Standards provides: "Conflicts of interest.

"A prosecutor should avoid the appearance or reality of a conflict of interest with respect to his official duties. In some instances, as defined in the Code of Professional Responsibility, his failure to do so will constitute unprofessional conduct."

The Commentary to § 1.2 (Approved Draft 1971, incorporating language from the original version of the standard in the Tentative Draft of 1970) illustrates the standard:

"A conflict of interest may arise when for example,

(i) a law partner or other lawyer professionally associated with the prosecutor or a relative appears as, or of, counsel for a defendant;

(ii) a business partner or associate or a relative has any interest in a criminal case, either as a complaining witness, a party, or as counsel."

The Commentary refers also to ABA Code DR 5–101(A), which provides:

"Except with the consent of his client after full disclosure, a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property, or personal interests."

(Footnote deleted.)
*See also* DR 9–101:

"Avoiding Even the Appearance of Impropriety.

"(A) A lawyer shall not accept private employment in a matter upon the merits of which he has acted in a judicial capacity.

"(B) A lawyer shall not accept private employment in a matter in which he had substantial responsibility while he was a public employee.

"(C) A lawyer shall not state or imply that he is able to influence improperly or upon irrelevant grounds any tribunal, legislative body, or public official."

(Footnotes deleted.)

Since the record does not show that Mr. Taylor acted "in a judicial capacity" for the SEC in matters relating to this case, the decision in *American Cyanamid Co. v. FTC,* 363 F.2d 757 (6th Cir. 1966), is inapposite; to the extent *United States v. Braniff Airways, Inc.,* 428 F.Supp. 579 (W.D.Tex.1977), rests on a conflict of advocatory and judicial roles, it too is inapposite. In addition, *Braniff* was expressly disapproved in *In re Perlin, supra,* 589 F.2d at 265 n. 5.

**64.** *In re Perlin, supra,* 589 F.2d at 265; *accord, Dondich, supra,* 460 F.Supp. at 856.

Further, both courts noted [65] that the position which defendants herein urge would frustrate the congressional policy of fostering intragovernmental cooperation in criminal prosecutions. This policy is implemented in 28 U.S.C. § 515(a) [66] and in the recent amendments to F.R.Crim.P. 6(e). [67] The Supreme Court has recently noted the importance of such intragovernmental cooperation in *United States v. LaSalle National Bank,* 437 U.S. 298, 312–13, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978).

 In sum, the better view appears to be that there is no inherent conflict of interest or other impropriety in the appointment of an agency attorney to assist in criminal proceedings before a grand jury, and we follow the recent decisions adopting this view. Of course, abuse of an attorney's dual employment status might be shown in particular cases, especially where the agency uses the grand jury investigation to gather information for civil administrative proceedings to which it would not otherwise have access. *Cf. LaSalle National Bank, supra.* But no such specific allegations are made in this case, nor could they plausibly be on this record. Accordingly, we find no basis for dismissing the indictment on this ground.

65. 589 F.2d at 265–67; 460 F.Supp. at 855–56; accord, *United States v. Fields, supra,* 592 F.2d at 644–46; *In re Grand Jury Subpoenas, April 1978, at Baltimore,* 581 F.2d 1103, 1109–10 (4th Cir. 1978).

66. *See, e. g.,* H.R.Rep.No.2901, 59th Cong., 1st Sess. (1906); *In Re Subpoena of Persico, supra,* 522 F.2d at 56–60; *United States v. Denton,* 307 F.2d 336 (6th Cir.), *cert. denied,* 371 U.S. 923, 83 S.Ct. 292, 9 L.Ed.2d 232 (1962); *Nick v. United States,* 406 F.Supp. 1 (E.D.Mo.1975), *aff'd,* 531 F.2d 936 (8th Cir. 1976). This court's decision in *In re Grand Jury Proceedings,* 309 F.2d 440 (3d Cir. 1962), is inapplicable to this case because the attorney there was not authorized under § 515(a).

67. The amendment in Rule 6(e)(2)(A), 18 U.S.C. (Supp.1978), permits disclosure of grand jury matters to

## V. GOVERNMENT'S PROMISE TO CONSIDER DEFERRED PROSECUTION

Finally, defendant Richman argues that the Government attorney did not in good faith carry out a promise to consider deferred prosecution and that, therefore, all evidence induced by such promise should be suppressed. At oral argument and in a subsequent letter to this court, counsel for Mr. Richman has urged that the recent decision in *United States v. Bowler,* 585 F.2d 851 (7th Cir. 1978), dictates grant of his motion for suppression. However, that case is inapposite.

*Bowler* concerned ambiguous language in a written. plea agreement. The defendant construed the language as a promise by the prosecution to consider reducing its recommendation as to jail sentence; the Government construed it merely as a unilateral option to recommend a lesser sentence. The court interpreted the agreement most favorably to the defendant, finding a promise to consider in good faith a lesser sentence recommendation by analyzing specific mitigating factors enumerated in the plea agreement. The Government's presentation to the sentencing judge showed no evidence that it had evaluated two of the three specific factors and showed affirmative evidence that it had not evaluated one

"(i) an attorney for the government for use in the performance of such attorney's duty; and

"(ii) such government personnel as are deemed necessary by an attorney for the government to assist an attorney for the government in the performance of such attorney's duty to enforce Federal criminal law." The stated purpose of the amendments was to lower the "barrier of secrecy . . . between the facets of the criminal justice system upon which we all depend to enforce the criminal laws." S.Rep.No. 95–354 at 6, reprinted at 1977 U.S.Code Cong. & Admin.News, pp. 527, 530. *See* Notes of the Advisory Committee on Rules to 1977 amendments to Fed.R.Cr.P. 6(e), reprinted at 18 U.S.C. Rule 6(e) (Supp.1978).

of the factors. On these facts, the court of appeals vacated the sentence and ordered specific performance of the Government's implied promise, requiring that the prosecution set forth its evaluation of each specific mitigating factor in the record at the time of resentencing. 585 F.2d at 855.

█ The instant case involves different facts and a different procedural history. There was no dispute that there was an oral promise "to consider recommending deferred prosecution," but merely a dispute whether the Government had carried out its promise. The parties had the benefit of a hearing addressed specifically to that issue of fact, unlike the parties in *Bowler.* After hearing live testimony from both sides, the district court in this case found as a fact that the prosecutor "did in fact, in good faith, consider all of the relevant factors known to him in making his decision against recommending deferred prosecution." [68] That finding is not "clearly erroneous." [69] Therefore, Mr. Richman's argument must fail.

## VI. DISPOSITION

We conclude that the appearance of impropriety created by a Government attorney's taking the witness stand in grand jury proceedings does not on this record warrant so extreme a sanction as a prophylactic rule of dismissal; and we find that defendants could have suffered no actual prejudice from the prosecutor's testimony in this case. We further conclude that the dual employment status of a Government agency attorney specially authorized under 28 U.S.C. § 515(a) to assist Department of Justice attorneys in grand jury proceedings creates neither an actual nor an apparent conflict of interest, absent a showing that the grand jury investigation was exploited for an improper purpose. Therefore, the denial of defendant Birdman's and defendant Richman's motions for dismissal of the indictments was not error.

**68.** Richman Appendix at 186.

**69.** *See Government of the Virgin Islands v. Gereau,* 502 F.2d 914, 922–23, 927 (3d Cir.

We further conclude that the district court was not clearly erroneous in finding no breach of the Government's promise to consider deferred prosecution of Mr. Richman, and that the denial of Mr. Richman's motion to suppress evidence was not erroneous.

The judgments of sentence will be affirmed.

1974), *cert. denied,* 420 U.S. 909, 95 S.Ct. 829, 42 L.Ed.2d 839 (1975).