THOMAS A. ULLMANN *v.* STATE OF CONNECTICUT
(14620)

PETERS, C. J., CALLAHAN, BORDEN, BERDON and M. HENNESSEY, Js.

Argued March 22—decision released August 9, 1994

*G. Douglas Nash,* public defender, for the plaintiff in error.

*Susan C. Marks,* assistant state's attorney, with whom on the brief, were *Michael Dearington,* state's attorney, and *James G. Clark,* assistant state's attorney, for the defendant in error.

*Glenn E. Coe* and *Andrew Houlding* filed a brief for the Connecticut Criminal Defense Lawyers Association, Inc., as amicus curiae.

CALLAHAN, J. The plaintiff in error, Thomas A. Ullmann (plaintiff), was held in criminal contempt by the trial court pursuant to General Statutes § 51-33[1] for refusing to testify in a criminal trial. He later filed a motion to vacate the judgment of contempt, which the trial court denied. The plaintiff subsequently filed this writ of error.

The plaintiff, the public defender for the judicial district of New Haven, had represented a defendant, Eddie Ford, in a criminal case from approximately July, 1991, until June, 1992, at which time the plaintiff withdrew from the case and a special public defender was appointed. Ford, who originally had been charged in an information with one count each of robbery in the first degree, robbery in the second degree and tampering with a witness, was further charged on August 1, 1992, with an additional count of tampering with a witness.

The additional count of tampering with a witness was occasioned when, on June 1, 1992, a witness in Ford's case, Carlos Robles, received a collect telephone call in which he was threatened with bodily harm if he testified against Ford. During Ford's trial, the state intro-

---

[1] General Statutes § 51-33 provides: "PUNISHMENT FOR CONTEMPT OF COURT. Any court, including a family support magistrate, may punish by fine and imprisonment any person who in its presence behaves contemptuously or in a disorderly manner; but no court or family support magistrate may impose a greater fine than one hundred dollars or a longer term of imprisonment than six months or both."

duced evidence that the call had been placed at approximately 9:43 p.m. from a telephone located in a cellblock at the New Haven community correctional center. An administrative captain at the correctional center testified that Ford had been incarcerated in that cellblock on June 1, and that he was one of approximately twenty inmates with access to the telephone used to call Robles at the relevant time.

The plaintiff was subpoenaed to testify in Ford's trial with regard to the tampering charge relating to the telephone call. The trial commenced on August 31, 1992. On September 1, 1992, the plaintiff moved to quash the subpoena. Outside the presence of the jury, the assistant state's attorney prosecuting Ford's case made the following offer of proof concerning the information that the state sought to elicit from the plaintiff: "I will ask him where he works for background, who he is and what he does. I will ask him then did you represent Eddie Ford from approximately July 30 of 1991 until June 28, 1992, in this criminal case. On June 1 of 1992 did you meet with me in my office. . . . Did I then give you a copy of several police reports including State's Exhibit L . . . ." The state continued with its offer of proof as follows: *"Prior to my giving you that document did you have the phone number and address of Carlos Robles. The answer to that I believe will be no.* And then the last question I would ask, did you meet with Eddie Ford that evening at the Whalley Avenue Correctional Center and I will stop at that point." (Emphasis added.)

The following facts are undisputed. The meeting between the plaintiff and the assistant state's attorney, wherein the plaintiff received police reports, one of which contained Robles' telephone number, took place at approximately 4 p.m. on June 1, 1992. The plaintiff met with Ford at the correctional center at approximately 6 p.m. on that same day. Robles' tele-

phone number was not listed in the New Haven telephone directory under "Robles." Instead, it was listed under "Santos-Robles." Thus, the number was not readily available to anyone who lacked that information. Because Robles testified that he did not recognize the voice on the telephone to be that of Ford, the state's theory of Ford's criminal liability for tampering with a witness was not confined to Ford as a principal but also included Ford as an accessory.

The state claimed that the testimony that it sought to elicit from the plaintiff would permit the jury to infer that Ford had obtained Robles' telephone number from the plaintiff during their meeting at the correctional center on the evening of June 1, 1992. The plaintiff objected to answering the proposed questions on the ground that to do so would require him to disclose information relating to his representation of his client from which allegedly privileged communications could be inferred.[2] The plaintiff argued to the trial court that any disclosure of information relating to the representation of his former client was barred by the Rules of Professional Conduct, the attorney-client privilege, and the work product doctrine. He also argued that the information could be obtained through other means, would damage his attorney-client relationship with Ford, and would also damage the relationship of the public defender's office with other clients. The trial court rejected his claims and denied his motion to quash the subpoena.

The plaintiff subsequently took the stand at Ford's trial. In response to the state's questions, he testified that he had been employed by the office of the public defender since 1977, and that he had represented Ford. When asked, however, whether he had met with the

[2] The plaintiff also did not stipulate to any of the information sought to be elicited by the state.

assistant state's attorney on June 1, 1992, he refused to answer and further indicated that he would not answer the remainder of the questions proposed by the state. When directed by the court to answer, the plaintiff again refused. When the court inquired of Ford as to whether he would waive the attorney-client privilege, he stated that he would not. The court thereupon held the plaintiff in criminal contempt "for refusing to answer, to obey the direct order of the court," and fined him $100.

Ford was convicted of the robbery charges and the charge of tampering with a witness that involved the telephone call made from the correctional center on June 1, 1992. On appeal, however, the Appellate Court reversed Ford's conviction of tampering with a witness arising from that telephone call, holding that the state had failed to adduce sufficient evidence to prove that it had been Ford or someone acting at his behest, rather than any of the other inmates with access to the telephone, acting on his own, who had made that call. *State* v. *Ford,* 33 Conn. App. 143, 634 A.2d 1188 (1993), cert. granted, 228 Conn. 918, 636 A.2d 849 (1994). We subsequently reversed the judgment of the Appellate Court and reinstated the jury verdict. *State* v. *Ford,* 230 Conn. 686, 646 A.2d 147 (1994).

After Ford's trial had concluded, the plaintiff filed a motion to vacate the judgment of contempt against himself on the grounds that the trial court improperly had punished him for criminal rather than civil contempt, and that the trial court had failed to balance the need for this testimony against the possible harm to the attorney-client relationship. The trial court denied the motion to vacate the contempt judgment. The plaintiff then filed this writ of error, claiming that: (1) the exclusive sanction for his refusal to testify is contained

in General Statutes § 51-35,[3] a civil contempt statute; (2) the testimony that the state sought to elicit was protected by the attorney-client privilege and the work product rule; and (3) the trial court improperly balanced the need for his testimony against the possible harm to the attorney-client relationship.

## I

This case comes to us on a writ of error, which is the sole method of reviewing a summary criminal contempt proceeding. *Naunchek* v. *Naunchek,* 191 Conn. 110, 113, 463 A.2d 603 (1983); *Moore* v. *State,* 186 Conn. 256, 257, 440 A.2d 969 (1982). This court's review of summary criminal contempt is limited to three issues: "(1) whether the designated conduct is legally susceptible of constituting a contempt . . . (2) whether the punishment imposed was authorized by law . . . and (3) whether the judicial authority was qualified to conduct the hearing." (Citations omitted.) *Moore* v. *State,* supra, 257. We are concerned in this instance with only the issue of whether the punishment was authorized by law.

The plaintiff initially argues that the trial court improperly held him in criminal contempt pursuant to § 51-33 for refusing to testify. He contends that his refusal to testify could be addressed only as a civil contempt pursuant to § 51-35. We disagree.

Section 51-33, the criminal contempt statute, has its origins in a statute enacted in 1667. 2 J. Hammond, Public Records of the Colony of Connecticut, From 1665–77 (1852) p. 60. As codified in 1796, the statute provided that "if any Person . . . in the Presence of

[3] General Statutes § 51-35 provides in part: "WITNESS REFUSING TO TESTIFY; IMPRISONMENT. SELF-INCRIMINATION. (a) Any court or family support magistrate may commit to a community correctional center any person legally summoned who refuses to appear and testify before it in any case, there to remain at his own expense until he so testifies."

any Court, shall, either in Words or Actions behave contemptuously or disorderly, it shall be in the power of the Court . . . to inflict such Punishment upon him or them as they shall judge most suitable to the Nature of the Offence." General Statutes (1796) "An Act Concerning Delinquents," ¶8, p. 143. The progenitor of § 51-35, the civil contempt statute, was enacted in 1711. It provided that "any Person who shall be required to give his evidence upon tryal . . . and shall refuse to make oath to answer to such questions . . . shall be by such court . . . committed to goal, and there remain at his own cost and charge until he shall give evidence as aforesaid." 5 C. Hoadly, Public Records of the Colony of Connecticut from October, 1706 to October, 1716 (1870) p. 233. By 1887, both statutes approximated their present form. General Statutes (1887 Rev.) §§ 842[4] and 843;[5] see also General Statutes (1902 Rev.) §§ 508 and 506; General Statutes (1918 Rev.) §§ 5522 and 5520; General Statutes (1930 Rev.) §§ 5407 and 5405; General Statutes (1949 Rev.) §§ 7704 and 7702; General Statutes (Rev. to 1993) §§ 51-35 and 51-33. Nowhere in the language of § 51-35 or its legislative history is there any indication that it was intended to preempt § 51-33 or that it was to be the exclusive sanction for the refusal of a witness to testify.

The plaintiff contends, however, that the rules of statutory construction compel the conclusion that § 51-35 governs all contempts involving

[4] General Statutes (1887 Rev.) § 842 provided in relevant part: "Any court may commit to jail any person legally summoned, who shall refuse to appear and testify before it in any case, there to remain at his own expense until he shall so testify."

[5] General Statutes (1887 Rev.) § 843 provided: "Any court may punish by fine and imprisonment, any person, who shall, in its presence, behave contemptuously or disorderly; but no justice of the peace shall inflict a greater fine than seven dollars, nor a longer term of imprisonment than thirty days; and no other court shall inflict a greater fine than one hundred dollars, nor a longer term of imprisonment than six months."

a refusal to testify. Specifically, the plaintiff relies on the principle that specific terms addressing a subject matter should prevail over general language covering the same subject matter. See, e.g., *Plourde* v. *Liburdi,* 207 Conn. 412, 417, 540 A.2d 1054 (1988). We note, however, that § 51-33 and its predecessors merely codify the court's inherent common law power to punish all contempts committed in its presence, including a refusal to testify. See *Middlebrook* v. *State,* 43 Conn. 257, 267 (1876). Absent clear intent to do so, a " 'statute should not be construed as altering the common law rule . . . and should not be construed as making any innovation upon the common law which the statute does not fairly express.' " *State* v. *Kish,* 186 Conn. 757, 764, 443 A.2d 1274 (1982); *State* v. *Nugent,* 199 Conn. 537, 548, 508 A.2d 728 (1986). In the absence of an explicit declaration, we conclude that, by enacting § 51-35, the legislature did not intend to eliminate the traditional common law remedies available for a refusal to testify.

The plaintiff cites *Wilson* v. *Cohen,* 222 Conn. 591, 610 A.2d 1177 (1992), in support of his position that he could not be held in criminal contempt pursuant to § 51-33. In *Wilson,* we upheld the trial court's imposition of a six month sentence for criminal contempt pursuant to § 51-33 for a witness' refusal to testify. In a footnote, we said in dictum, however, that "[t]he conduct for which the trial court held the plaintiff in contempt in this case arguably constituted a civil contempt, in that the plaintiff could have 'purged' himself by agreeing to testify. . . . Because the plaintiff has not challenged the classification of his conduct as criminal contempt, however, we treat his refusal to testify as a criminal contempt in accordance with our precedent." Id., 596 n.5. The plaintiff argues that this court's language in *Wilson* is indicative of our concern over the classification of a refusal to testify as criminal con-

tempt. *Wilson,* however, merely reflects our recognition that a refusal to testify may, at the discretion of the trial judge, be the ground for finding either civil or criminal contempt depending on the exigencies of a particular situation, which finding may be challenged by the contemnor on a case-by-case basis.

The plaintiff also cites *McCarthy* v. *Clancy,* 110 Conn. 482, 148 A. 551 (1930). In *McCarthy,* we upheld the constitutionality of a statute that authorized a term of imprisonment for a refusal to testify in a grand jury proceeding until the witness had agreed to testify. In its decision, the *McCarthy* court noted that "[w]hen sitting as a court, justices have always had the power to commit a witness refusing to answer any proper question in any action pending before them . . . a power which in criminal proceedings received statutory recognition as early as 1711." Id., 497. The plaintiff contends that *McCarthy* stands for the proposition that civil contempt provides the only appropriate remedy for the refusal of a witness to testify.[6] We disagree.

We read *McCarthy* as standing for the proposition that civil contempt may provide one applicable and appropriate remedy for the refusal of a witness to testify. We have never held, however, that civil contempt furnishes the only remedy for such refusal. See *Moore* v. *State,* supra, 186 Conn. 258 (plaintiff conceded that unjustifiable refusal of witness to answer proper questions before judicial tribunal constituted criminal con-

---

[6] Similarly, the plaintiff claims that *In re Application of Clark,* 65 Conn. 17, 31 A. 522 (1894), stands for the proposition that the civil contempt statute is the exclusive remedy for a refusal to testify. In that case, this court stated that "[t]he power to commit for a refusal to answer, given to every court, is not called a contempt, but is a power given to enforce the duty to appear and testify. General Statutes § [51-35]. While the power given to every court to punish for criminal contempt is given as a distinct power. General Statutes § [51-33]." Id., 33. This statement, however, merely distinguishes the underlying policies of each statute and does not imply that the exclusive remedy for a refusal to testify is civil contempt.

tempt, so long as punishment kept within six month term provided by § 51-33).

Our case law classifies civil contempt as conduct directed against the rights of the opposing party; *Connolly* v. *Connolly,* 191 Conn. 468, 482, 464 A.2d 837 (1983); *McTigue* v. *New London Education Assn.,* 164 Conn. 348, 352, 321 A.2d 462 (1973); while criminal contempt consists of conduct that is directed against the dignity and authority of the court.[7] *McClain* v. *Robinson,* 189 Conn. 663, 666, 457 A.2d 1072 (1983); *Moore* v. *State,* supra, 186 Conn. 258. A witness' refusal to testify in response to an order of the court may, however, be inimical to the rights of the opposing party *and* simultaneously affront the dignity and authority of the court. As we noted in *Wilson,* when a witness refuses to testify "there is an overwhelming necessity for empowering a court to adjudicate the contempt summarily and to impose punishment sufficiently substantial *to cause the witness to reconsider and deter such conduct by others.*" (Emphasis added.) *Wilson* v. *Cohen,* supra, 222 Conn. 604. The form in which the court's contempt power is exercised depends on the court's perception of the paramount interest to be vindicated and the least onerous way of vindicating that interest, as dictated by the particular facts and circumstances sur-

[7] Swift's Digest of 1823 lists a witness' failure to testify as an example of direct contempt, for which the general contempt statute (i.e., General Statutes § 51-33) provided an appropriate remedy. 2 Z. Swift, A Digest of the Laws of the State of Connecticut (1823) pp. 359–60. Swift cited Blackstone's treatise on the English common law as authority for this proposition. In *Valeriano* v. *Bronson,* 209 Conn. 75, 91 n.10, 546 A.2d 1380 (1988), we stated that "any reliance on Swift would [be] a weak position" where Swift did not indicate whether he had relied on English common law or this state's common law for a proposition. Swift, however, states in the preface to volume I of his digest that his "plan [was] to *select from the English authorities, the rules in force here,* and to combine them with our own, in a systematic view, so as to exhibit one complete code." (Emphasis added.) As such, we find persuasive Swift's example of a recalcitrant witness as a direct contempt punishable by the predecessor to § 51-33.

rounding the witness' refusal to testify. See *Dukes* v. *Durante,* 192 Conn. 207, 228, 471 A.2d 1368 (1984); *Niles* v. *Niles,* 9 Conn. App. 240, 253, 518 A.2d 932 (1986).

Section 51-33 permits the court to impose a definite sentence of not more than six months imprisonment or a fine not greater than $100 for an affront to its dignity and authority, such as noncompliance with a court order. Section 51-35, however, provides the court with an alternate means to address the refusal of a witness to testify when ordered to do so. By authorizing the commitment of a recalcitrant witness until he or she testifies, § 51-35 provides the court with a method specifically designed to compel the witness' testimony. Depending on the facts of a particular case, the rights of an opposing party may be the paramount interest implicated by a witness' refusal to testify, and the compulsion of testimony pursuant to § 51-35 may be the most effective measure to address and vindicate that interest. The determination of the interest to be addressed and the method of addressing it, however, is left to the sound discretion of the court. "It is well settled that the imposition of sanctions to compel the observance of its orders rests within the discretion of the trial court and will not be disturbed on review unless there is an abuse of discretion."[8] *Fox* v. *First Bank,*

[8] This case demonstrates the desirability of affording the trial court discretion in choosing between the remedies embodied in General Statutes §§ 51-33 and 51-35. In holding the plaintiff in contempt, the trial court stated: "I do not think under the circumstances that in consideration of the fact that I am dealing with a member of the bar, the public defender for this district, it calls for incarceration." Moreover, it is evident that the trial court was of the opinion that neither the threat of incarceration nor incarceration itself would cause the plaintiff to retreat from his position that he could not, in good conscience, testify. If the plaintiff's argument, that a refusal to testify must always be addressed by resort to § 51-35, were accepted, the trial court would have been precluded from considering such circumstances and would have been required to incarcerate the plaintiff. The adoption of such a rule would also emasculate the trial court's con-

198 Conn. 34, 39, 501 A.2d 747 (1985); see *Thode* v. *Thode,* 190 Conn. 694, 462 A.2d 4 (1983); *In re Mongillo,* 190 Conn. 686, 461 A.2d 1387 (1983).

Although "whether a contempt is civil or criminal turns on the 'character and purpose' of the sanction involved";[9] *International Union, United Mine Workers of America* v. *Bagwell,* U.S. , 114 S. Ct. 2552, 2557, 129 L. Ed. 2d 642 (1994); the United States Supreme Court has indicated that "the stated purposes of a contempt sanction alone cannot be determinative." Id. "[C]onclusions about the civil or criminal nature of a contempt sanction are properly drawn, not from 'the subjective intent of a State's laws and its courts'. . . but 'from an examination of the character of the relief itself . . . .' " (Citations omitted.) Id. Accordingly, a court's power to hold a party in civil or criminal contempt is not limited by the nature of the offense. Rather, it is the nature of the relief itself that is instructive in determining whether a contempt is civil or criminal.[10]

tempt power if the witness whose testimony was ordered were already incarcerated. See, e.g., *Wilson* v. *Cohen,* supra, 222 Conn. 593–94.

[9] For example, in *Tatro* v. *Tatro,* 24 Conn. App. 180, 587 A.2d 154 (1991), the Appellate Court held that the imposition of imprisonment for civil contempt was improper when the witness was unable to comply with the court's order to bring her child before the court because the child was out of the country. The court noted that "[i]n the absence of the ability to purge herself of the failure to bring her child before the court, the punishment imposed by the court ceased to be coercive and became wholly punitive, which is not in the character of civil contempt." Id., 187. In the present case, the plaintiff's refusal to testify may well have offended the dignity and authority of the court so that the penalty imposed was "punitive in order to vindicate the authority of the court." *McTigue* v. *New London Education Assn.,* supra, 164 Conn. 353.

[10] "Most contempt sanctions share punitive and coercive characteristics, and the fundamental question underlying the distinction between civil and criminal contempts is what process is due for the imposition of any particular contempt sanction." *International Union, United Mine Workers of America* v. *Bagwell,* supra, 114 S. Ct. 2554. The right to a jury trial attaches to criminal contempts involving imprisonment in excess of six months. Id., 2557.

"[P]etty, direct contempts in the presence of the court [such as a refusal to testify] traditionally have been subject to summary adjudication, 'to main-

A contempt fine is civil if it either " 'coerce[s] the defendant into compliance with the court's order, [or] . . . compensate[s] the complainant for losses sustained.' . . . Where a fine is not compensatory, it is civil only if the contemnor is afforded an opportunity to purge." (Citation omitted.) Id., 2558. In the present case, the fine imposed on the plaintiff for refusing to testify was not compensatory and the plaintiff was not afforded an opportunity to purge himself by agreeing to testify. Rather, the trial court imposed a flat, unconditional fine of $100 on the plaintiff. "[A] 'flat, unconditional fine' totalling even as little as $50 announced after a finding of contempt is criminal if the contemnor has no subsequent opportunity to reduce or avoid the fine through compliance." Id. Accordingly, we conclude that it was permissible for the trial court to hold the plaintiff in criminal contempt and that the nature of the penalty it imposed properly reflects the imposition of criminal contempt.

II

The plaintiff next claims that the testimony sought by the state was protected by the attorney-client privilege and the work product rule and, as a result, the trial court improperly held him in contempt for his refusal to testify. We are unpersuaded.

At the outset, we note that the attorney-client privilege is strictly construed because it "tends to prevent a full disclosure of the truth in court . . . ." C. Tait & J. LaPlante, Connecticut Evidence (2d Ed. 1988)

tain order in the courtroom and the integrity of the trial process in the face of an "actual obstruction of justice." ' " Id., 2560. Because a refusal to testify may be dealt with through summary adjudication does not mean that such a refusal may not be treated as a criminal contempt. " 'Petty contempt like other petty criminal offenses may be tried without a jury'. . . and the imposition only of serious criminal contempt fines triggers the right to a jury trial." Id., 2562 n.5.

§ 12.5.1; *Turner's Appeal,* 72 Conn. 305, 318, 44 A. 310 (1899). The attorney-client privilege protects communications between client and attorney when made in confidence for the purpose of seeking or giving legal advice. *State* v. *Cascone,* 195 Conn. 183, 186, 487 A.2d 186 (1985). Statements made in the presence of a third party, on the other hand, "are usually not privileged because there is then no reasonable expectation of confidentiality." Id.

In the present case, the state asked the plaintiff whether he had met with the state's attorney on June 1, 1992. The plaintiff refused to answer. In addition, the state indicated that it intended to ask the plaintiff whether he had known Robles' address and telephone number prior to meeting with the state's attorney, whether the state's attorney gave him a copy of the police report containing Robles' address and telephone number, and whether he had met with Ford after meeting with the state's attorney and receiving the police report. The plaintiff also refused to answer those proposed questions, and now contends that they directly implicate matters protected by the attorney-client privilege. We disagree.

We have previously held that a communication between a defendant's attorney and a state's attorney concerning a plea agreement does not fall within the scope of the attorney-client privilege. *State* v. *Burak,* 201 Conn. 517, 526, 518 A.2d 639 (1986). Such information, we concluded, failed to qualify for the attorney-client privilege because it involved statements made to a third party, with no attendant expectation of confidentiality. See id. Similarly, we fail to see how the fact of a meeting between the plaintiff and the state's attorney in this case, or what transpired at that meeting, could constitute privileged communications protected by the attorney-client privilege. Requiring the plaintiff to answer the state's question as to whether

he had met with the state's attorney on June 1, therefore, did not violate the attorney-client privilege.

We are equally unpersuaded under the facts of this case that the answer to a question posed to the plaintiff as to whether he had met with his client would have encroached upon the attorney-client privilege. The plaintiff met with his client at the New Haven community correctional center, a public institution. Because of the nature of the institution, the plaintiff's meeting with his client would have been witnessed and recorded by department of correction personnel, and the fact that a meeting had taken place would not have been, and could not have been, confidential.

Furthermore, the mere fact that a meeting took place between the plaintiff and his client did not constitute a communication and such information is not privileged for that reason. *State* v. *Yates,* 174 Conn. 16, 19–20, 381 A.2d 536 (1977). "In its questioning of [the plaintiff], the state did not seek the substance of any communication that [the plaintiff] may have had with his client." Id. In *State* v. *Manning,* 162 Conn. 112, 120, 291 A.2d 750 (1971), we concluded that the attorney-client privilege had not been violated when the defendant's previous attorney was asked whether he had had "certain conversations with [the defendant]" and "[w]here were those conversations held." Similarly, the attorney-client privilege was not violated in the present case when the state's attorney sought information as to whether the plaintiff had met with his client on a particular date.

"The fact that an attorney may not disclose privileged communications between himself and his client does not affect his capacity and his duty to testify as to other matters when called on to do so. We are in accord with the majority rule that the privilege does not extend beyond communications." Id. In short, we conclude that

the plaintiff's meeting with his client was not a confidential communication that fell within the parameters of the attorney-client privilege. See C. Tait & J. LaPlante, supra, § 12.5.2.

We similarly conclude that, in the circumstances of this case, the inquiry as to whether the plaintiff had known Robles' telephone number prior to the plaintiff's meeting with the state's attorney did not require the disclosure of information protected by the attorney-client privilege. "[S]ince the privilege has the effect of withholding relevant information from the factfinder, it applies only where necessary to achieve its purpose. Accordingly it protects only those disclosures—*necessary to obtain informed legal advice*—which might not have been made absent the privilege." (Emphasis added.) *Fisher* v. *United States,* 425 U.S. 391, 403, 96 S. Ct. 1569, 48 L. Ed. 2d 39 (1976); see also *United States* v. *DeFazio,* 899 F.2d 626, 635 (7th Cir. 1990) (attorney-client communications are privileged only if they constitute legal advice or client confidences); *In re Grand Jury Subpoena Duces Tecum,* 731 F.2d 1032, 1036 (2d Cir. 1984); *State* v. *Cascone,* supra, 195 Conn. 186 (privilege protects only communications between client and attorney when made in confidence *for the purpose of seeking or giving legal advice*). Not every communication between attorney and client falls within the privilege. A communication from attorney to client solely regarding a matter of fact would not ordinarily be privileged, unless it were shown to be inextricably linked to the giving of legal advice. See *Turner's Appeal,* supra, 72 Conn. 318 ("[s]uch a request by a client to his attorney, made for the purpose of obtaining information for the former's benefit, upon a matter of fact, and not for the purpose of asking the attorney's advice, ought not to be regarded as a privileged communication"); C. Tait & J. LaPlante, supra, § 12.5.2.

In this case, the state sought to establish, through the plaintiff's testimony, that he had communicated Robles' telephone number to Ford when he and Ford met at the correctional center at approximately 6 p.m. on June 1. The plaintiff has made no showing, either in the trial court or in this court, that such a communication of fact was inextricably linked to the giving of legal advice by the plaintiff to Ford. Indeed, the plaintiff never asked the trial court to restrict the question so as to exclude any communication between himself and Ford. Because, on its face, the content of the testimony that the state sought to elicit from the plaintiff "[would] not [have] reveal[ed], either directly or implicitly, legal advice given [to Ford] or any client confidences"; *United States* v. *DeFazio,* supra, 899 F.2d 635; requiring the plaintiff to testify would not have implicated the attorney-client privilege.

The plaintiff also claims that the information sought by the state was not subject to disclosure because it came under the work product rule and the Practice Book rules relating to discovery.[11] We disagree.

The work product rule protects an attorney's " 'interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs and countless other tangible and intangible items.' " *Barksdale* v. *Harris,* 30 Conn. App. 754, 760, 622 A.2d 597, cert. denied, 225 Conn. 927, 625 A.2d 825 (1993). "Work product can be defined as the result of an attorney's activities when those activities have been conducted with a view to pending or anticipated litigation." (Inter-

---

[11] The plaintiff relies specifically on Practice Book § 773 which provides in relevant part: "Except as to scientific or medical reports, Sec. 756 does not authorize or require disclosure or inspection of:

"(1) Reports, memoranda or other internal defense documents made by the defendant, or his counsel or any person employed by the defendant in connection with the investigation or defense of the case."

nal quotation marks omitted.) *Stanley Works* v. *New Britain Redevelopment Agency,* 155 Conn. 86, 95, 230 A.2d 9 (1967).

In the present case, the state's attorney sought testimony as to whether the plaintiff had knowledge of Robles' address and telephone number prior to his meeting with the state's attorney and his being shown the police report. The plaintiff does not claim that Robles was a prospective witness for the defense whose identity, address and telephone number the plaintiff had ascertained only as part of his investigation on Ford's behalf. It is difficult to conceive that questioning the plaintiff as to whether he simply was aware of Robles' address and telephone number prior to meeting with the state's attorney would require the disclosure of information procured by the plaintiff's activities in preparation for trial, i.e., "with a view to pending or anticipated litigation." The limited questioning that the state proposed would have revealed only when Robles' telephone number was obtained by the plaintiff and what was done with it, not what was obtained. What was obtained was already known to the state. Such a factual inquiry was not foreclosed by the work product rule or the rules of discovery.

### III

Finally, the plaintiff claims that, even if the questions proposed by the state did not require the disclosure of communications or information protected by either the attorney-client privilege or the work product rule, the trial court abused its discretion by requiring him to testify because it failed to balance properly the state's need for his testimony against the harm to the attorney-client relationship. The plaintiff, in essence, urges the adoption of a balancing test that weighs the potential injury to the attorney-client relationship against the need for an attorney's testimony prior to requiring the

attorney, particularly a public defender, to testify in a case involving his or her client.[12]

At the outset, we note that courts have been reluctant to allow attorneys to be called as witnesses in trials in which they are advocates.[13] See *Rudolph* v. *State,* 829 P.2d 269, 273 (Wyo. 1992); see also *United States* v. *Birdman,* 602 F.2d 547, 553 (3d Cir. 1979), cert. denied, 444 U.S. 1032, 100 S. Ct. 703, 62 L. Ed. 2d 668 (1980). When either party in a criminal case seeks testimony from the prosecuting attorney, the federal courts have applied a "compelling need" test.[14] See *United States* v. *Prantil,* 764 F.2d 548, 554 (9th Cir. 1985); *United States* v. *Dack,* 747 F.2d 1172, 1176 n.5 (7th Cir. 1984); *United States* v. *Birdman,* supra, 553; *United States* v. *Schwartzbaum,* 527 F.2d 249, 253 (2d Cir. 1975), cert. denied, 424 U.S. 942, 96 S. Ct. 1410,

---

[12] The plaintiff seeks to extend our holding in *State* v. *Cascone,* supra, 195 Conn. 183, to situations involving prosecutorial subpoenas of defense attorneys in cases against their clients. In *Cascone,* we considered whether an accomplice's statement made to his attorney was protected by the attorney-client privilege even after the accomplice testifies in the criminal prosecution. In determining whether the accomplice waived the privilege, this court considered whether " '[t]he *injury* that would inure to the [attorney-client] relation by the disclosure of the communicatio[n] [is] *greater than the benefit* thereby gained for the correct disposal of litigation.' " (Emphasis in original.) Id., 189.

[13] The advocate-witness rule, as it is commonly referred to, "does not render the attorney incompetent as a witness or disqualify him [or her] from testifying, although it may be a serious impropriety for him [or her] both to testify and to continue active participation in the case. *State* v. *Blake,* [157 Conn. 99, 102, 249 A.2d 232 (1968)]; *Lebowitz* v. *McPike,* 151 Conn. 566, 570, 201 A.2d 469 (1964); *Puglio* v. *Puglio,* 18 Conn. App. 606, 608, 559 A.2d 1159 (1989). To [call one's own attorney as a witness], the party must demonstrate the necessity for the testimony, such as 'an emergency the likelihood of which could not reasonably have been anticipated in time for [the attorney] to withdraw from the case before trial.' *State* v. *Blake,* supra [102]." *State* v. *Thompson,* 20 Conn. App. 290, 295, 567 A.2d 837 (1989).

[14] The compelling need test has been characterized as "a reiteration of the judicial antipathy toward any deviation from the advocate-witness rule." *United States* v. *Prantil,* 764 F.2d 548, 554 (9th Cir. 1985).

47 L. Ed. 2d 348 (1976). Under this test, the party wishing to call a prosecutor to testify must show that the testimony of the prosecutor is "necessary and not merely relevant," and that all other available sources of comparably probative evidence have been exhausted. *State* v. *Thompson,* 20 Conn. App. 290, 297, 567 A.2d 837 (1989); see also *United States* v. *Prantil,* supra, 551; *Rudolph* v. *State,* supra, 273.

The policy behind the compelling need test in the context of requiring a prosecutor to testify is fourfold: "First, there is the risk that the prosecutor may not be a fully objective witness. [*United States* v. *Birdman,* supra, 602 F.2d 553]. Second, there exists the justifiable fear that, when a prosecutor takes the witness stand, 'the prestige or prominence of the prosecutor's office will artificially enhance his credibility as a witness.' *United States* v. *Johnston,* 690 F.2d 638, 643 (7th Cir. 1982). Third, the jury may understandably be confused by the prosecutor's dual role. Id. . . . Finally, a broader concern for public confidence in the administration of justice suggests the maxim that 'justice must satisfy the appearance of justice.' " (Citation omitted.) *State* v. *Thompson,* supra, 20 Conn. App. 296; *United States* v. *Birdman,* supra, 554.

Those same or analogous concerns exist if the prospective witness is or had been counsel for the defendant.[15] We believe that the policy concerns under-

[15] The concerns raised by requiring a defense attorney to testify are at least equal to the concerns implicated by requiring a prosecutor to testify. See *State* v. *Stiltner,* 61 Wash. 2d 102, 104–105, 377 P.2d 252 (1962), cert. denied, 380 U.S. 924, 85 S. Ct. 928, 13 L. Ed. 2d 810 (1965) ("The right of the prosecutor to call defense counsel as witness is within the broad discretion of the trial court; however, a weather eye must be kept on the constitutional rights of the defendant in a criminal trial at all times. . . . The right of one to call the other is not exactly a 'two-way street' in view of [the] defendant's constitutional rights."). For example, the sixth amend-

lying the compelling need test are valid and adopt that test as the criteria to be applied when either side in a criminal case seeks to call a prosecutor or defense attorney, who is or has been professionally involved in the case, to testify.[16] The compelling need test strikes the appropriate balance between the need for the information and the potential adverse effects on the attorney-client relationship and the judicial process in general.

The concern that a prosecutor may not be a fully objective witness applies equally to defense attorneys. The fact that an attorney has withdrawn from the case does not alleviate this concern, particularly where, as

ment may be implicated in calling a defendant's current defense attorney to testify. See, e.g., *United States* v. *Diozzi,* 807 F.2d 10 (1st Cir. 1986).

We recognize that, in the present case, the plaintiff had withdrawn from representing Ford at the time the prosecutor sought to call him as a witness. Concerns similar to those implicated when a defendant's current attorney is called to testify are also implicated, however, when a defendant's former attorney is called to testify.

[16] We note that a similar test has been propounded in rule 3.8 (f) of the Model Rules of Professional Conduct in the context of requiring prior judicial approval of subpoenas directed at attorneys in grand jury or criminal proceedings. Connecticut has not adopted model rule § 3.8 to date. See generally F. Zacharias, "A Critical Look at Rules Governing Grand Jury Subpoenas of Attorneys," 76 Minn. L. Rev. 917 (1992). In addition, the American Bar Association has issued a policy resolution requiring a showing tantamount to a compelling need and prior judicial approval of prosecutorial subpoenas directed at attorneys. See also Justice Department Guidelines for United States Attorneys, "Policy with Regard to the Issuance of Grand Jury or Trial Subpoenas to Attorneys for Information Relating to the Representation of Clients."

We recognize that the compelling need test originated in response to the potential for prosecutorial abuse of the subpoena power. See F. Zacharias, supra, 924. Although the plaintiff was subpoenaed to testify in the present case, the propriety of that subpoena is not at issue nor has any prosecutorial wrongdoing been alleged in seeking the plaintiff's testimony. We note that, although the prosecutor's duty is to seek justice, not simply to obtain a conviction; *State* v. *Hammond,* 221 Conn. 264, 292, 604 A.2d 793 (1992); the prosecutor has the right and the duty to represent the state zealously within the bounds of the law. See *In re Dodson,* 214 Conn. 344, 352, 572 A.2d 328, cert. denied, 498 U.S. 896, 111 S. Ct. 247, 112 L. Ed. 2d 205 (1990).

here, the plaintiff withdrew solely because he antici-
pated being called as a witness in the case.[17] It is con-
ceivable that the plaintiff still had an interest in Ford's
defense; see *United States* v. *Birdman,* supra, 602 F.2d
553; which had been taken over by one of his colleagues
in the public defender's office. See *Jennings Co.* v.
*DiGenova,* 107 Conn. 491, 498–99, 141 A. 866 (1928).

The court in *Birdman* cited the fear that the prose-
cutor's credibility would be enhanced if he or she took
the stand as a witness due to the prestige of the prose-
cutor's office. A jury is likely to give " 'to the evidence
of the prosecuting attorney far greater weight than to
that of the ordinary witness.' " *United States* v. *Bird-
man,* supra, 602 F.2d 554. Similarly, a jury is likely to
give to the testimony of a defense attorney, present
or former, far greater weight due to the defense attor-
ney's unique position to assess his or her client's cul-
pability.

The most significant factor relates to public confi-
dence in our criminal justice system.[18] "Public confi-
dence in our criminal justice system may be eroded by
even the appearance of impropriety. *United States* v.
*Prantil,* supra [764 F.2d 553]." *State* v. *Thompson,*
supra, 20 Conn. App. 296. " 'Especially in criminal liti-

---

[17] The plaintiff withdrew, with permission of the court, from represent-
ing Ford pursuant to rule 3.7 of the Rules of Professional Conduct. Rule
3.7 (a) provides in pertinent part: "A lawyer shall not act as an advocate
at a trial in which the lawyer is likely to be a necessary witness."

[18] It is noteworthy that the *Johnston* court rejected a claim that the
advocate-witness rule has no application to proceedings tried before a judge.
*United States* v. *Johnston,* supra, 690 F.2d 638. The court conceded that
a judge, as opposed to a jury, may be better able to take account of a wit-
ness prosecutor's adversarial role and may be less apt to confuse the roles
of witness and prosecutor. Id., 644. The court further noted that a judge
"would not be swayed by the prominence or prestige of a government pros-
ecutor in assessing the credibility of his [or her] testimony." Id. In holding
the advocate-witness rule applicable to proceedings tried before a judge
and upholding the lower court's decision to bar the prosecutor's testimony,
the court relied primarily on the concern over "the maintenance of public
confidence in the ultimate fairness of judicial proceedings." Id.

gation, where so much is at stake for the defendant, must the Bench and Bar demand adherence to a principle that is designed to ensure objectivity in the presentation of evidence.' '' *United States* v. *Birdman,* supra, 602 F.2d 553, quoting *United States* v. *Alu,* 246 F.2d 29, 34 (2d Cir. 1957). A defendant's former attorney testifying against his or her client might compromise the appearance of justice in our courtrooms, lending credence to the unfortunate belief among some that, rather than being advocates for their clients, defense counsel are "part of the 'system' ''; R. Flemming, "Client Games: Defense Attorney Perspectives on their Relationships with Criminal Clients," 2 Am. B. Found. Res. J. 253, 254 (1986); and, together with prosecutors and the judiciary, are "bound together in 'an organized system of complicity.' '' R. Uphoff, "The Criminal Defense Lawyer: Zealous Advocate, Double Agent, or Beleaguered Dealer?" 28 Crim. L. Bull. 419, 423 (1992), quoting A. Blumberg, "The Practice of Law as Confidence Game: Organizational Co-optation of a Profession," 1 Law & Soc. Rev. 15, 22 (1967). "Particularly in criminal trials, where the full weight of the government is brought to bear against a solitary individual, even the appearance of such bias could impair public confidence in the fairness of the judicial process."[19] *United States* v. *Johnston,* supra, 690 F.2d 644.

[19] Concerns in addition to the ones noted by the *Birdman* court are implicated in requiring a prosecutor or a defendant's present or former attorney to testify. In the present case, had the plaintiff testified, Ford's trial counsel may have sought to offset the prejudicial effect of the testimony of the plaintiff by attempting to impeach him. In such a situation, the witness "runs the risk of impeachment or otherwise being found not credible by the [court] . . . which could impair not only continuation as an effective advocate in the case, but could also produce lingering adverse aftereffects." *United States* v. *Johnston,* supra, 690 F.2d 643.

In addition, any cross-examination of the attorney witness might be constrained, as claimed in the present case, by the invocation of the attorney-client privilege. In the present case, Ford's attorney stated: "By the very fact that an attorney-client relationship exists between Mr. Ford and [the

In adopting the compelling need test, we note that "[t]he trial court is charged with making the determination of the materiality of the witness' testimony and must, of course, honor the defendant's constitutional rights of confrontation and compulsory process. *United States* v. *Prantil,* supra, [764 F.2d] 552." *State* v. *Thompson,* supra, 20 Conn. App. 297. "[T]he vast weight of authority indicates that 'any decision whether or not to allow an attorney to be called is left to the discretion of the trial judge.' Therefore, in reviewing [the] appellant's claims we will only reverse the decision of the trial court if there was an abuse of discretion." *Rudolph* v. *State,* supra, 829 P.2d 272; see also *State* v. *Williams,* 656 P.2d 450, 453 (Utah 1982). "The issue, therefore, is not whether we would reach the same conclusion in the exercise of our own judgment, but only whether the trial court acted reasonably."[20] *State* v. *Deleon,* 230 Conn. 351, 363, 645 A.2d 518 (1994); see also *State* v. *S & R Sanitation Services,* 202

plaintiff] my position for cross-examining [the plaintiff] is limited. I cannot cross-examine him as if he were just an ordinary witness. . . . If I'm denied the right to cross-examine him I would then ask that any testimony given [by] him on direct be stricken." The court acknowledged that the cross-examination of the plaintiff would be impeded: "You're restricted in cross-examination because your client asserts his attorney-client privilege."

[20] Although the plaintiff did not rely specifically on the compelling need test at trial in seeking to avoid being called as a witness, the plaintiff raised the same issues that would have been raised had the compelling need test been applied. It was not until the plaintiff moved to vacate the judgment of contempt that he specifically called the compelling need test to the trial court's attention. The trial court stated: "[W]ith all due respect, you have not touched on one single subject that wasn't touched on two weeks ago or thereabouts when we had this hearing. . . . You haven't given me anything, you haven't referred to anything that I didn't already consider. I assure you I did balance the need for the testimony against the harm to the attorney-client relationship with [the plaintiff] and his clients and future clients." Moreover, the plaintiff conceded at oral argument in this court that the trial court applied the appropriate balancing test.

Conn. 300, 311–12, 521 A.2d 1017 (1987). We cannot say that the trial court abused its discretion in this case.

In the present case, the trial court found that the testimony that the state sought to elicit from the plaintiff was necessary to the state's case. It is significant that the testimony related to a charge of tampering with a witness, a crime that strikes at the heart of the integrity of our justice system. The trial court specifically found that "[t]he state did make a showing that the evidence was essential." It also determined that whether the plaintiff had Robles' address and telephone number prior to meeting with the assistant state's attorney on June 1, 1992, was a fact exclusively within the plaintiff's knowledge and therefore the state could not secure this information in any manner other than through the plaintiff's testimony. In so finding, the court weighed the necessity for the plaintiff's testimony against any harm that might result to the attorney-client relationship by requiring the plaintiff to testify.

The testimony anticipated by the state would have revealed that approximately two hours after the plaintiff first learned of Robles' telephone number, he met with Ford and that approximately three and one-half hours later on that same day the telephone call in question was made. This testimony, particularly the close time sequence, would have strengthened significantly the inference that Ford had made or had caused to be made the phone call to Robles from the correctional center. Whether the plaintiff had Robles' telephone number prior to June 1 could possibly have been inferred from other evidence. For example, the prosecutor could have testified that he had not given the plaintiff the telephone number prior to June 1. Such evidence, however, would not have foreclosed the possible inference that the plaintiff had received Robles' telephone number prior to June 1 in some manner other than through

his meeting with the prosecutor. Only the plaintiff could have testified that he had first received Robles' telephone number at the June 1 meeting.[21] Without the plaintiff's testimony, it was possible for the jury to discount the fact that the call to Robles was made on June 1 as having no significance in proving that it was Ford who had made the telephone call or had caused the telephone call to be made on that date.

The Appellate Court reversed Ford's conviction for tampering with a witness on the basis of insufficient proof that it was Ford who had made the telephone call or had caused the telephone call to be made.[22] *State v. Ford,* supra, 33 Conn. App. 151. Arguably, the result in the Appellate Court would have been different had the plaintiff's potential testimony been elicited. Although we reversed the Appellate Court and concluded that there was sufficient evidence to support Ford's conviction, the Appellate Court decision makes clear that it was reasonable for the trial court to conclude that the plaintiff's testimony was "essential" to the state's case against Ford.

We recognize the delicate nature of the relationship between a public defender and his or her client. Trust

[21] We recognize that the testimony that the state sought as to whether the plaintiff had met with the assistant state's attorney and with his client possibly could have been elicited from other witnesses. Once the plaintiff was required to testify as to whether he had knowledge of Robles' telephone number prior to meeting with the assistant state's attorney, however, there was little, if any, additional harm to the attorney-client relationship presented by the facts of this case in requiring the plaintiff to answer the state's questions as to whether he had met with the assistant state's attorney and his client on the date in question.

[22] This court granted certification in the case of *State v. Ford,* 228 Conn. 918, 636 A.2d 849 (1994), limited to the following issue: "Did the Appellate Court properly conclude that there was insufficient evidence to convict the defendant of the crime of tampering with a witness, General Statutes §§ 53a-151 and 53a-8?"

and confidentiality are key elements in any attorney-client relationship, and these qualities take on added significance when the attorney is a public defender appointed to represent a client who often enters the relationship with a certain degree of distrust. We conclude nonetheless that the trial court did not abuse its discretion when it ordered the plaintiff to testify.

The writ of error is dismissed.

In this opinion PETERS, C. J., and BORDEN and M. HENNESSEY, Js., concurred.

BERDON, J., dissenting. Today the majority makes it fair game for the state's attorney to call a public defender as a witness against his own client, ask questions that are merely relevant to a criminal prosecution, without any compelling need for the testimony, and force the public defender to respond under penalty of criminal contempt. As a result the public defender is faced with the following dilemma: compliance with the court order, thereby giving the appearance that he or she betrayed the client, or refusal to testify, at the risk of being held in contempt and subject to penalty of fine and imprisonment. Attorney Thomas Ullmann, much to his credit, stood on principle, refusing to testify against his client, and was held in contempt and criminally punished. Through its strained decision, the majority carves that finding of criminal contempt in stone. In my opinion, Ullmann should look upon this conviction not as a badge of disgrace, but rather the unfortunate result of fulfilling his professional obligations to his client, and others he will represent as a public defender in the future.

It will be helpful to restate the pertinent facts, none of which are disputed. Ullmann, the public defender for the judicial district of New Haven, employed by the state of Connecticut, represented the criminal defend-

ant Eddie Ford for nearly one year. Ford was originally charged with robbery and one count of witness tampering arising out of an incident unrelated to this appeal. Pursuant to his representation of Ford on these charges, Ullmann met with assistant state's attorney James G. Clark (prosecutor) on June 1, 1992, at approximately 4 p.m., and the prosecutor gave Ullmann several police reports. One of the police reports (Exhibit L) contained the name, address and telephone numbers of several persons, including a witness to the robbery named Carlos Robles. At approximately 6 p.m., Ullmann met with his client at the New Haven community correctional center where he was being held for trial. At 9:43 p.m. that evening, Robles received an anonymous telephone call from a telephone located at the correctional facility to which Ford and nineteen other inmates had access, threatening him with harm should he testify.

The next day, which followed two days of jury selection in Ford's trial, Ullmann filed a motion to withdraw from representing Ford and sought appointment of a special public defender. Ullmann's withdrawal was compelled by the Rules of Professional Conduct because, as the prosecutor later noted, Ullmann could potentially be called as a witness in the case. See Rules of Professional Conduct 3.7 ("[a] lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness"). It is a fair inference that his withdrawal was the result of the prosecutor putting Ullmann on notice that he intended to call Ullmann as a witness in Ford's criminal trial.

The trial court granted Ullmann's motion, appointed special public defender Michael Moscowitz to represent Ford, and declared a mistrial. Subsequently, the state charged Ford with an additional count of tampering with a witness based on the theory that Ford or an accomplice telephoned Robles on June 1, 1992, from

the correctional facility, using the telephone number obtained from Ullmann on that date, and threatened him with harm should he testify.

At the subsequent trial, to support the additional count against Ford, the prosecutor subpoenaed Ullmann to testify against his former client. Upon Ullmann's motion to quash the subpoena and his objections to being called by the state as a witness, the prosecutor represented to the trial court that he would offer to prove through Ullmann the following: "I will ask him where he works for background, who he is and what he does. I will ask him . . . did you represent Eddie Ford from approximately July 30 of 1991 until June 28, 1992, in this criminal case. On June 1 of 1992 did you meet with me in my office. . . . I will ask what time [it was] and I believe the time was approximately four in the afternoon. Did I then give you a copy of several police reports including State's Exhibit L . . . . Prior to my giving you that document did you have the phone number and address of Carlos Robles. The answer to that I believe will be no. And then the last question I would ask, did you meet with Eddie Ford that evening at the [correctional facility] and I will stop at that point."

Ullmann's attorney objected to the proffered testimony. He argued that the facts the state sought to elicit from Ullmann were available from other credible sources, including the prosecutor himself. The prosecutor argued that it would take five witnesses to establish these facts without his testimony, and there was one fact that could be established only through Ullmann's testimony. This fact was that Ullmann did not know Robles' telephone number prior to meeting with the prosecutor. The trial court ordered Ullmann to testify. Ullmann refused, and was held in contempt of the court and fined $100.

The jury found Ford guilty of the June 1, 1992 witness tampering count, notwithstanding Ullmann's failure to testify and the state's failure to introduce through the testimony of others the evidence it sought to obtain through Ullmann. Ford appealed to the Appellate Court and a majority of a three member panel of that court held that there was insufficient evidence to support the conviction. *State* v. *Ford,* 33 Conn. App. 143, 634 A.2d 1188 (1993). The court, over my dissent, subsequently reversed the judgment of the Appellate Court and reinstated the conviction. *State* v. *Ford,* 230 Conn. 686, 646 A.2d 147 (1994).

In deciding this case we need not reach the issue of whether a person who refuses to testify is subject to civil or criminal contempt. Furthermore, we need not decide whether the evidence the prosecutor sought to elicit from the public defender was protected by the attorney-client privilege.[1] Rather, the dispositive issue is as follows: under what conditions and circumstances may a prosecutor subpoena and compel a public defender to give testimony that is not privileged against his or her client.

I recognize that justice may require a public defender, or for that matter a prosecutor, to testify when called by his or her adversary. Nevertheless, any rule that we adopt for the compelled disclosure of nonprivileged testimony that relates to the representation of a criminal defendant must take into account not only the

---

[1] Although I do not reach these issues, I note that the implications of the majority's reasoning are disturbing. I suppose the following can be gleaned from their decision: a person who refuses to testify can be held and punished for both civil and criminal contempt; and although an attorney cannot be compelled to testify as to what he or she told a client, he or she can be compelled to testify as to facts from which the jury could infer the content of the communications with the client. The ramifications of these holdings by the majority are troubling to say the least.

important interests of the state in enforcing the criminal laws but also the special considerations applicable to the relationship between a public defender and an indigent defendant.

We must face the reality that an attorney-client relationship characterized by honesty and trust can unfortunately be difficult to maintain between public defenders and their clients. It is true that "systemic, comparative analyses of the impact of defense attorneys on . . . measures of case outcomes such as sentencing" have indicated that "public [defender] clients do not fare more poorly in court than their peers who retain private counsel." R. Flemming, "Client Games: Defense Attorney Perspectives on Their Relationships with Criminal Clients," 2 Am. B. Found. Res. J. 253, 268 (1986). Nevertheless, "[a] rather substantial body of research agrees that in contrast with their attitudes toward privately retained attorneys, criminal defendants see publicly paid and assigned counsel as part of the 'system'—overly eager to plead them guilty, disinclined to give them much time, and little concerned about their welfare." Id., 254. Indigent criminal defendants, and many other members of society, are cynical about the fairness afforded indigent defendants by the criminal justice system. The specter of a public defender being compelled to testify against his or her client in order to provide an inference to be drawn from a confidential attorney-client meeting would be devastating to the *appearance* of justice in our courtrooms.[2]

Ullmann eloquently testified before the trial court about this delicate relationship as follows: "As the public defender of the New Haven judicial district, an office

---

[2] Commentators have pointed to a perception of overreaching by United States attorneys in recent years as evidence of the potential for and reality of prosecutorial abuse of the subpoena power against defense counsel. See, e.g., W. Genego, "Risky Business: The Hazards of Being a Criminal Defense Lawyer," 1 Crim. Justice 2 (1986).

which handles 250 cases currently pending of which 35 to 50 percent of those cases are incarcerated along with Mr. Ford at the correctional center, and with my firm belief that there are other ways that the state could elicit such information, I believe that I would be violating not only my allegiance to Mr. Ford but to many, many other people and that the damage that would be done by my answering the state's questions, even in spite of the fact that the court has ordered me to do that, would be far reaching and would affect not only the representation in my office currently with any number of pending cases that exist . . . but with other attorneys in the New Haven judicial district with cases pending whose clients are at the jail for a long period of time. I desire not to be a party to that. I don't believe I should have been put in this position and I think there are matters, there are times when someone has to make a decision as a matter of principle and conscience in regards to his professional responsibility. I mean no disrespect to the court."

The compelling need test referred to by the majority, *properly applied,* would accommodate the competing needs of the state and the defendant in their pursuit of justice. If the state is able to show a compelling need for the testimony, it may call the public defender and, likewise, if the defendant demonstrates a compelling need for the testimony of the prosecutor, he or she may call the prosecutor.[3] The majority purports to adopt the compelling need test, yet they water down its application so much in the present case that in its diluted form it might as well be referred to as the "convenient or helpful" test.

---

[3] In order to do justice, the state *or* the defendant may have a compelling interest to call the attorney on the other side. See, e.g., *United States* v. *Prantil,* 764 F.2d 548, 551–54 (9th Cir. 1985) (reversing conviction where participating prosecutor was one of several witnesses to acts underlying crime because defendant had compelling need to call that prosecutor as witness).

Like the majority, I would adopt the compelling need test. I believe that it is evident, however, that under that test the trial court abused its discretion in the present case. In order to demonstrate a compelling need, the state, or the defendant as the case may be, should be required to demonstrate that (1) there is no feasible alternative for obtaining the information; *United States* v. *Prantil,* 764 F.2d 548, 551 (9th Cir. 1985); *United States* v. *Torres,* 503 F.2d 1120, 1126 (2d Cir. 1974) ("[t]here was no showing that any of the other people who were in the courtroom at the time Ortiz and Torres allegedly conversed, such as marshals, court clerks, court reporters or interpreters, were unavailable to testify"); *State* v. *Thompson,* 20 Conn. App. 290, 297, 567 A.2d 837 (1989); and (2) the evidence is essential, not merely relevant, to the success of the prosecution or the defense, as the case may be. This rule is substantially similar to the guidelines recently adopted by the American Bar Association; A.B.A., Model Rules of Professional Conduct 3.8 (f) (1992); 1 G. Hazard, The Law of Lawyering (2d Ed. 1993) § 3:100 et seq.;[4] and by the United States Justice Department. Justice Department Guidelines for United States Attorneys, "Policy with Regard to the Issuance of Grand Jury or Trial Subpoenas to Attorneys for Information Relating to the Representation of Clients."

The state did not make the requisite showing in the present case, because there were feasible alternatives for obtaining the information sought. In addition to the

---

[4] Rule 3.8 of the Model Rules of Professional Conduct provides in relevant part: "The prosecutor in a criminal case shall . . . (f) not subpoena a lawyer in a grand jury or other criminal proceeding to present evidence about a past or present client unless: (1) the prosecutor reasonably believes: (i) the information sought is not protected from disclosure by any applicable privilege; (ii) the evidence sought is essential to the successful completion of an ongoing investigation or prosecution; (iii) there is no other feasible alternative to obtain the information; and (2) the prosecutor obtains prior judicial approval after an opportunity for an adversarial proceeding."

circumstantial evidence presented at Ford's trial; see *State* v. *Ford,* supra, 230 Conn. 694; the prosecutor, an attorney with no personal ties to the state like the one between the public defender and client, could have withdrawn from his role as advocate and testified as follows. On June 1, 1992, he met with Ullmann at approximately 4 p.m.;[5] he gave Ullmann the police report containing Robles' phone number; the prosecutor had never before given this telephone number to Ullmann or to the defendant; Robles was a material witness to the prosecution of the defendant and was scheduled to appear in court several days later; and none of the other nineteen inmates on the defendant's cellblock who had access to the telephone from which the collect call was placed to Robles had any connection to the prosecution of Ford. A correction official could have testified, on the basis of business records of the institution, that Ullmann had met with Ford in a professional visit at approximately 6 p.m. that same day. The prosecutor and the correction officials likely would be credible witnesses in the eyes of the jury and thus excellent substitutes for Ullmann's testimony. Finally, evidence could have been presented that Robles' telephone number was not readily available to the public because it was listed in the telephone directory as "Santos-Robles."

As previously indicated, the prosecutor made two arguments against the use of alternatives to Ullmann's testimony. First, he argued that it would take "five witnesses to cover those seven questions so that we won't have to call Mr. Ullmann." This argument was sanctioned by the trial court in its decision, although it is unclear why it would take five witnesses. At any rate, a compelling need must consist of something more than

---

[5] Moscowitz, Ford's attorney, offered to stipulate that Clark had given the police report to Ullmann, which would have left that crucial piece of evidence uncontroverted.

mere inconvenience to the state. Absent the inconvenience argument, the state's claim, as the majority concedes, is reduced to the following: there is one (and only one) fact—that Ullmann did not know the telephone number before meeting with the prosecutor—that could only be established through Ullmann's testimony.

First of all, there exist feasible alternatives even with regard to this particular fact, because the prosecutor could have testified that he never made the information available to Ullmann prior to their meeting, and an employee of the telephone company could have testified that Robles' telephone number was not listed under "Robles" in the telephone directory, allowing the jury to draw the same inference that it could have drawn from the testimony sought from Ullmann.

Even conceding no feasible alternatives, however, the evidence does not meet the second prong of the compelling need test. The fact that Ullmann did not have the information prior to his meeting with the prosecutor, although relevant, has but marginal incremental value to the state's case considering all the circumstantial evidence available to the state. Indeed, I am troubled by the fact that on this day, the court holds in *State v. Ford,* supra, 230 Conn. 686, that there was sufficient evidence to sustain Ford's conviction of the June 1, 1992 witness tampering charge, the very same charge for which the majority holds that Ullmann's testimony was compellingly necessary. I am bewildered by how Ullmann's testimony could possibly be compelling if in fact it was not required to support Ford's conviction. The majority attempts to explain their conclusion by reference to the trial court's discretion, and distances themselves from that decision by stating that " '[t]he issue . . . is not whether we would reach the same conclusion in the exercise of our own judgment, but only whether the trial court acted rea-

sonably.' " The trial court's discretion cannot shield the majority from their ultimate decision in this case. Accordingly, I would reverse Ullmann's conviction of contempt on the ground that there was no showing of a compelling need to require Ullmann to testify.

The majority opinion has the potential to undermine the credibility and integrity of our public defender system. It is well known that public defenders face great institutional difficulties, despite their best efforts, in obtaining the trust and confidence of their indigent, often incarcerated, clients. R. Flemming, supra, 254; J. Casper, American Criminal Justice: The Defendant's Perspective (1972) pp. 100–25. Casper examined a study of indigent criminal defendants who had gone through the Connecticut criminal system in the late 1960s, and determined that a far greater proportion of defendants represented by private counsel than by public defenders answered "yes" to the question: "Do you think [your lawyer] was on your side?" J. Casper, supra, p. 105. One criminal defendant reported his belief, unfortunately representative of many of the indigent clients studied, that " '[a] public defender is just like the prosecutor's assistant. Anything you tell this man, he's not gonna do anything but relay it back to the [prosecutor]. . . .' "[6] Id., pp. 107–108. These perceptions undermine the vital attorney-client relationship, without which the fundamental right to assistance of

---

[6] Casper ascribed these perceptions on the part of indigent defendants to the public defender's peculiar institutional position. Casper points out that many public defenders are beleaguered under heavy caseloads, with the result that they settle many cases through plea negotiations with the state. They appear before the same trial judges and the same state's attorneys day in and day out. They are assigned to an indigent defendant with no opportunity for the defendant to choose his or her own attorney. Finally, they are paid by the state, not the client. All of these realities combine to create the perception among many indigent clients that public defenders are part of the system, and have no incentive to defend the client vigorously. J. Casper, supra, pp. 103, 105, 106–107, 109, 110–11.

counsel for indigent defendants; *Gideon* v. *Wainwright,* 372 U.S. 335, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963); is an empty promise.

Public defenders face their own professional difficulties as well—their calling is difficult on every technical, physical, emotional and moral level. Charles Ogletree, Jr., a Harvard law professor and a former District of Columbia public defender, recently urged that the legal profession strive to strengthen the relationship between public defender and indigent client. C. Ogletree, "Beyond Justifications: Seeking Motivations to Sustain Public Defenders," 106 Harv. L. Rev. 1239 (1993). The majority, by upholding the compulsion of a public defender to testify against his or her own client under penalty of contempt when there was simply no compelling need shown, will have a devastating effect on this relationship.[7] "Integrity is the very breath of justice. Confidence in our law, our courts and the administration of justice is our supreme interest. No practice must be permitted to prevail which invites toward the administration of justice a doubt or distrust of its integrity." *Jennings Co.* v. *DiGenova,* 107 Conn. 491, 499, 141 A. 866 (1928).

I respectfully dissent.

---

[7] Notwithstanding the majority opinion, the chief state's attorney may desire, out of concern for the fair administration and appearance of justice in this state, to follow the lead of the Justice Department of the United States by adopting guidelines for the issuance of trial subpoenas against defense attorneys. See Justice Department Guidelines for United States Attorneys, "Policy with Regard to the Issuance of Grand Jury or Trial Subpoenas to Attorneys for Information Relating to the Representation of Clients." In this regard, rule 3.8 of the Model Rules of Professional Conduct would provide an excellent model. See footnote 4.